## APPEAL OF HERALD-DESPATCH COMPANY.

Docket No. 4556.   Decided September 27, 1926.

1. The Board has no jurisdiction to entertain an appeal from a determination by the Commissioner of deficiencies in excise taxes for the years 1909, 1910, 1911, and 1912, levied under the Corporation Excise Tax Act of August 5, 1909, or an appeal from a determination by the Commissioner of deficiencies in income taxes for the years 1913, 1914, and 1915, levied under the provisions of the Income Tax Act approved October 3, 1913.

2. Upon the evidence, *held*, that the actual cash value, at the date of acquisition, of the circulation of the Decatur Despatch, acquired by the petitioner for capital stock in 1906, was $4,500, and the invested capital, as determined by the Commissioner, should be increased by this amount. The evidence is insufficient to establish

the value of the archives and good will acquired from the Despatch at the same time.

3. The circulation and good will of the Decatur Evening Republican, having, at the time, an actual cash value of $18,237.01, of which $15,000 was the actual cash value of the circulation, was paid in to the petitioner by its stockholders in 1899, without any consideration therefor. *Held*, that the circulation structure of a newspaper so acquired is intangible property within the purview of section 207 of the Revenue Act of 1917 and section 325 of the Revenue Act of 1918.

4. Intangible property paid to a corporation, without any consideration therefor, may not be included in invested capital, under the provisions of section 207(a)(3) of the Revenue Act of 1917 and section 326(a)(3) of the Revenue Act of 1918, as paid-in surplus.

5. The Commissioner's reduction of petitioner's invested capital for the year 1919, on account of income and profits taxes for the years 1917 and 1918, is in conformity with the provisions of the regulations in force in respect of the year 1919, and, therefore, correct under the provisions of section 1207 of the Revenue Act of 1926.

6. Since the Commissioner has not asserted a deficiency for the year 1917, because of the running of the statute of limitations, this Board is without jurisdiction to consider the issues raised by this appeal in respect of that year.

7. The archives of a corporation engaged in the publication of a newspaper are tangible property, and their March 1, 1913, value is not susceptible of ascertainment by the formulæ usually employed for the valuation of intangibles. Petitioner's archives had a fair market value at March 1, 1913, of $12,000.

8. Upon the evidence, *held*, that the fair market value, at March 1, 1913, of petitioner's intangible assets was not in excess of the value of $102,548.86 placed thereon by the Commissioner, for the purpose of determining the gain or loss resulting from the sale thereof in 1920.

*Arnold L. Guesmer, Esq.*, for the petitioner.
*Arthur J. Seaton, Esq.*, for the Commissioner.

The Commissioner has determined a deficiency in income and profits taxes for the taxable years 1909 to 1920, inclusive, in the net amount of $9,857.05, made up as follows:

| Year | Deficiency | Overassessment |
|---|---|---|
| 1909 | $131.41 | |
| 1910 | 167.73 | |
| 1911 | 159.06 | |
| 1912 | 116.53 | |
| 1913 | 17.34 | |
| 1916 | | $28.64 |
| 1918 | | 1,783.06 |
| 1919 | 230.92 | |
| Two-month period Jan. 1 to Feb. 29, 1920 | 10,845.76 | |
| Total | 11,668.75 | 1,811.70 |

Five questions are presented for our consideration, as follows:

(1) The inclusion in invested capital of $4,800 alleged to be the value of archives, circulation, and good will acquired for capital stock.

(2) The inclusion in invested capital of $18,237.01 as paid-in surplus, representing the value of certain assets paid in by the stockholders.

(3) The reduction of invested capital for the taxable year 1919 by the amount of income and profits-tax liability for the years 1917 and 1918, respectively, prorated from the dates such taxes, or any installments thereof, became due and payable.

(4) Whether the petitioner deducted 1916 income taxes in the amount of $628.73 in computing its taxable net income for 1917.

(5) The amount of profits realized by the petitioner upon the sale of its assets and business in 1920.

### FINDINGS OF FACT.

The petitioner, an Illinois corporation with its principal office at Decatur, was, during the taxable years and period in question, engaged in the publication of a morning newspaper.

Petitioner was organized in 1890 and immediately acquired two newspapers, known as the Herald and the Despatch, which were being published by two separate organizations in Decatur, a town having then a population of approximately 16,000. The two papers were consolidated and thereafter published as a single publication under the name of the Morning Herald-Despatch, until about the year 1906, when the name was changed to the Decatur Herald. For the archives, circulation, and good will of the Despatch, the petitioner issued its capital stock of a par value of $4,800. The Despatch had been published for less than a year as a daily paper, and at the time it was taken over had a circulation of approximately 1,000, of which number about 100 were subscribers to the Herald. The facilities of the Despatch had also been used for job printing. The Commissioner held that the petitioner had failed to establish satisfactorily the actual cash value at the date of acquisition of the archives, circulation and good will acquired from the Despatch, and in the computation of petitioner's invested capital allowed no values in respect of those assets. The actual cash value, at the date of acquisition, of the circulation acquired from the Despatch was $4,500.

Until 1899 the petitioner had as a competitor in the morning field a daily newspaper known as the Decatur Daily Review. There was also being published in Decatur an evening newspaper known as the Decatur Evening Republican. The publication of the Decatur Evening Republican was discontinued on or about August 23, 1899, and its circulation and good will, having a then actual cash value

of $18,237.01, of which $15,000 represented the actual cash value of the circulation, were, by the then owners of that publication, who were also stockholders of the petitioner, paid in to petitioner without any consideration therefor. The Commissioner disallowed the said sum of $18,237.01 as a paid-in surplus, on the ground that the assets which it represents, viz, circulation and good will, are of an intangible nature, and consequently can not be included in invested capital as a paid-in surplus.

On August 23, 1899, the petitioner entered into an agreement with the Review Publishing Co., owners and publishers of the Decatur Daily Review, the purpose of which was to eliminate that publication as a competitior of the Decatur Herald in the morning field, to establish the former as an evening newspaper, and to discontinue the publication of the Decatur Evening Republican, leaving the afternoon field entirely open to the Review without competition. Under the terms of this agreement the petitioner agreed to sell, transfer and convey to the Review Publishing Co. the subscription lists, good will and daily subscription accounts of the Decatur Evening Republican; to abandon the publication of an evening paper in the County of Macon, State of Illinois, for a period of 15 years from August 26, 1899; to abandon and cease to print, for a like period, a Sunday edition, for circulation in Macon County, under any name or style; and to refrain for a like period from leasing, renting or granting to any person, type or machinery for the printing of a Sunday edition, for circulation in Macon County. In consideration of the foregoing covenants on the part of the petitioner, the Review Publishing Co. agreed to abandon the publishing of the Review as a morning paper, for a period of at least one year, saving and reserving to itself the right to publish such paper as a Sunday morning edition; and to refrain, for a period of 15 years, from leasing, renting, or granting to any person any type or machinery for the printing or circulation in Macon County of a morning paper, except a Sunday morning edition. Both parties agreed that in the event of the sale or lease by either of its plant, presses, type, good will, or newspaper, such sale or lease would be conditioned upon a full and strict compliance, by the purchaser or lessee, with the terms of this agreement.

In the computation of the petitioner's invested capital for the taxable years 1918 and 1919, the Commissioner deducted the amount of its liability for income and profits taxes for the years 1917 and 1918, respectively, as finally determined by him, prorated from the date such taxes, or any installment thereof, became due and payable.

The Commissioner increased the net income, as reported by the petitioner in its return for the taxable year 1917, by the amount of $628.73, representing the income tax for the taxable year 1916,

alleged by him to have been deducted by the petitioner, as an expense, in computing taxable net income. The petitioner did not make such a deduction in computing its taxable net income for the year 1917.

Under date of February 16, 1920, the petitioner entered into an agreement with the Decatur Herald Co., whereby it agreed to sell, transfer, and set over to the latter company all of its "goods, chattels, leases, moneys, credits, accounts, bills, notes, good will, choses in action, bonds, securities, contracts, agreements, franchises, and all other assets" of whatever nature and kind. In consideration for the assets to be transferred to it, the Decatur Herald Co. agreed "to pay, discharge, perform and fulfill all the debts, liabilities, contracts, engagements, and obligations" of the petitioner; to pay to the latter, in cash, the sum of $111,663.33; and to issue and deliver to it "Collateral Trust Serial seven per cent bonds of the par value of * * * $93,000, the same to be secured and issued in accordance with a certain collateral Trust Agreement." The contract was actually carried out and the sale consummated on or about March 1, 1920. The Commissioner held that upon this transaction the petitioner realized a taxable profit of $28,398.13, which he computed in the following manner:

| | | |
|---|---:|---:|
| Average earnings for five-year period prior to 1913 | | $21,970.89 |
| Less 8% on the average tangibles | | 6,588.56 |
| Balance of earnings attributable to intangibles | | 15,382.33 |
| Capitalized at 15% | | 102,548.86 |
| March 1, 1913, value of intangibles | | 102,548.86 |
| Subsequent additions to circulation structure | | 9,614.86 |
| Total value to be used in computing profit | | 112,163.72 |
| Amount included in balance sheet 2/29/20 | | 157,586.17 |
| Amount not allowable | | 45,422.45 |
| Total assets shown on books 2/29/20 | | 324,135.71 |
| Less: Depreciation reserve as adjusted | $36,435.68 | |
| Excessive appreciation on intangibles | 45,422.45 | |
| | | 81,858.13 |
| | | 242,277.58 |
| Less: Federal tax reserve included in accounts receivable | | 3,482.40 |
| Value of assets sold | | 238,795.18 |
| Consideration received: | | |
| Cash | $111,663.33 | |
| Bonds | 93,000.00 | |
| Accounts payable, assumed | 16,105.44 | |
| Prepaid subscriptions assumed | 18,202.50 | |
| Federal income tax, 1919, assumed | 15,422.62 | |
| | 254,393.89 | |
| Less: Overassessment of tax for prior years | 888.75 | |
| | | 253,505.14 |
| | | 14,709.96 |
| Plus: Liability for 1920 tax | | 13,688.17 |
| Profit | | 28,398.13 |

In the foregoing computation the Commissioner has treated the circulation structure and archives as intangible property, and the March 1, 1913, value of intangibles, therein shown, is intended by the Commissioner to include the value of the circulation structure and archives at that date. The cost to the petitioner of the circulation structure to March 1, 1913, was $76,218.95, and the cost of subsequent additions to the date of the sale was $13,852.56 rather than $9,614.86, as shown by the foregoing computation.

At March 1, 1913, the petitioner possessed such archives, commonly referred to in newspaper parlance as the "morgue," as are usually maintained in a newspaper establishment. The archives consisted of a library, plates, cuts, classified newspaper clippings, and bound volumes of newspaper editions, which had been collected over a long period of years, and which were in constant use as reference works in the publication of the newspaper. The archives were in charge of a librarian who devoted her entire time thereto. They were a part of the assets sold and transferred to the Decatur Herald Co. in 1920.

At March 1, 1913, W. H. Calhoun, one of petitioner's principal stockholders, was a member of the Associated Press, an incorporated association, under the laws of the State of New York, of certain persons, who, owning or representing certain newspapers, are united in a mutual and cooperative organization for the collection and interchange of information and intelligence for publication in the newspapers owned or represented by them. The petitioner, being a corporation, was not eligible to membership in the Associated Press, the charter and by-laws of the latter limiting membership to the sole or part owner of a newspaper, or an executive officer of a corporation, limited liability company, or joint-stock or other association which is the owner of a newspaper. Under the provisions of section 5, article VII of the by-laws of the Associated Press, Calhoun was required to "publish the news of the Associated Press only in the newspaper, the language, and the place specified in his certificate of membership." Said certificate of membership specified the "Decatur Herald, a morning newspaper published in the English language at Decatur, Illinois," as the paper, language and place for publication of the news furnished by the Associated Press. Prior to, at, and subsequent to March 1, 1913, the service obtained through Calhoun's membership consisted of receiving, over a leased wire, about 13,000 words a night of markets, sports, domestic and foreign news. The news received through such service was published by the petitioner in the Decatur Herald. The service furnished by the Associated Press, at March 1, 1913, was extremely valuable to petitioner in the publication of a morning newspaper. No other satisfactory service was available at that date. Without such a service the news available for publication would have been more or less limited to

local matters. The membership in the Associated Press was obtained by Calhoun without any cost to petitioner.

The by-laws of the Associated Press provide, among many things, that in case any member shall cease to be the owner, or part owner, of the newspaper specified in his certificate of membership, or shall cease to be an executive officer of a corporation, limited liability company, or joint-stock company or other association which is the owner of the newspaper specified in his certificate of membership, he shall *ipso facto* cease to be a member; that in case of the termination of his membership, by virtue of the cause above stated, a member, not then under process of discipline for violation of the rules or by-laws, may assign his membership to any other owner or part owner or executive officer of the corporation, limited liability company or joint-stock or other association which is the owner of such newspaper, who shall become a member upon signing the roll of members, and assenting to the by-laws, and, even without such assignment, such other executive officer, owner or part owner, thereupon shall become a member; that when a change is made in the ownership of any newspaper for which a member is entitled to receive a news service, the member may transfer his certificate of membership with his newspaper, and the new owner shall be constituted a member by virtue of such assignment; that the board of directors shall have no power to elect a new member until it shall have received a waiver in writing of the right of protest from all members entitled thereto, but no right of protest shall prevent such board from electing to membership the owner, part owner or executive officer of any corporation, limited liability company, joint-stock or other association, which is the owner of any newspaper which was entitled to a service of news under an existing contract with the Associated Press at September 13, 1900; that when any person shall have ceased to be a member and his successor shall have become entitled to membership, the board of directors, at the next meeting held thereafter, shall formally elect such successor and ratify his admission as a member; and that every member shall be eligible to election and to enjoy the privileges of membership, solely by virtue of his relation to the newspaper named in his certificate of membership.

## OPINION.

ARUNDELL: Since we have no jurisdiction over deficiencies asserted under revenue acts enacted prior to the Revenue Act of 1916, we can not consider the deficiencies proposed to be assessed for the years 1909 to 1913, inclusive. *Appeal of David B. Mills*, 1 B. T. A. 199. Nor have we been shown any basis for taking jurisdiction

over the years 1916 and 1918, in which years petitioner has been advised of overassessments. Our determination will therefore be limited to the deficiencies asserted for the years 1919 and the first two months of 1920.

By stipulation of the parties the right of the petitioner to include in invested capital the actual cash value of archives, circulation, and good will acquired for stock, at the date of acquisition, is admitted. This leaves solely the question as to their value at the date of acquisition. In our findings of fact we have found that the circulation of the Despatch had a value when acquired of $4,500. This is predicated upon a subscription list of 900 names, and the evidence convinces us that the value thereof at the date of acquisition was not less than $5 per name. As to the value of the archives and good will, the evidence is insufficient to support a finding as to what that value may have been. The invested capital as computed by the Commissioner, in the deficiency letter, should be increased by the amount of $4,500.

The second question is whether the petitioner is entitled to include in invested capital as paid-in surplus the sum of $18,237.01, representing the value of the circulation and good will of the Decatur Evening Republican, which assets were paid in by petitioner's stockholders without any consideration therefor. Of the value agreed upon $15,000 was assigned to the circulation. It was further stipulated by the parties that said sum of $18,237.01 should be added to the invested capital, as shown by the deficiency letter, if the Revenue Acts of 1917 and 1918 authorize the inclusion in invested capital, as paid-in surplus, of the actual cash value of intangibles paid in to a corporation without any consideration therefor.

Section 207 of the Revenue Act of 1917, in so far as it is pertinent to the present inquiry, defines invested capital as:

(a) In the case of a corporation or partnership: (1) Actual cash paid in. (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor), and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year: *Provided*, That (a) the actual cash value of patents and copyrights paid in for stock or shares in such corporation or partnership, at the time of such payment, shall be included as invested capital, but not to exceed the par value of such stock or shares at the time of such payment, and (b) the good will, trademarks, trade brands, the franchise of a corporation or partnership, or other intangible property, shall be included as invested capital if the corporation or partnership made payment bona fide therefor specifically as such in cash

or tangible property, the value of such good will, trade-mark, trade brand, franchise, or intangible property, not to exceed the actual cash or actual cash value of the tangible property paid therefor at the time of such payment; but good will, trade-marks, trade brands, franchise of a corporation or partnership, or other intangible property, bona fide purchased, prior to March third, nineteen hundred and seventeen, for and with interests or shares in a partnership or for and with shares in the capital stock of a corporation (issued prior to March third, nineteen hundred and seventeen), in an amount not to exceed, on March third, nineteen hundred and seventeen, twenty per centum of the total interests or shares in the partnership or of the total shares of the capital stock of the corporation, shall be included in invested capital at a value not to exceed the actual cash value at the time of such purchase, and in case of issue of stock therefor not to exceed the par value of such stock.

Section 326 of the Revenue Act of 1918 defines invested capital as follows:

(1) Actual cash bona fide paid in for stock or shares;

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: *Provided*, That the Commissioner shall keep a record of all cases in which tangible property is included in invested capital at a value in excess of the stock or shares issued therefor, containing the name and address of each taxpayer, the business in which engaged, the amount of invested capital and net income shown by the return, the value of the tangible property at the time paid in, the par value of the stock or shares specifically issued therefor, and the amount included under this paragraph as paid-in surplus. The Commissioner shall furnish a copy of such record and other detailed information with respect to such cases when required by resolution of either House of Congress, without regard to the restrictions contained in section 257;

(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year;

(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest;

(5) Intangible property bona fide paid in for stock or shares on or after March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year, whichever is lowest: *Provided*, That in no case shall the total amount included under paragraphs (4) and (5) exceed in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year; * * *

In neither of the sections of the two Acts quoted above is any reference made specifically to intangible property paid in to a corpo-

ration- without any consideration therefor. Both Acts specifically include within the definition of invested capital, intangible property *bona fide* paid in for stock or shares, subject to certain limitations. Unless intangibles acquired without cost can be included as a paid-in surplus they can not be included at all. Subdivision (a) (3) of section 207 of the Revenue Act of 1917 and subdivision (a) (3) of section 326 of the Revenue Act of 1918, taken by themselves, might conceivably be construed to permit the inclusion in invested capital of a paid-in surplus in respect of intangible property acquired by way of gift. It seems clear to us, however, that in providing for the inclusion in invested capital of intangibles paid in for stock or shares, subject to very specific and arbitrary limitations, Congress intended to exclude intangibles paid in as a gift. It would be absurd construction indeed which would permit the inclusion in invested capital, under very arbitrary limitations, of intangibles paid in for a consideration, and at the same time permit the inclusion of intangibles paid in as a gift to the full extent of their actual cash value. It will be noted that under the provisions of both Acts intangibles paid in for stock or shares can not be included in invested capital to the full extent of their actual cash value, if that value exceeds the par value of the stock issued therefor or a fixed percentage of the outstanding capital stock at March 3, 1917, or the beginning of the taxable year, whichever is lower. This we believe lends strength to the construction which we have placed upon the statutes. Reading together subdivisions (a) (3) and (a) (4) of the sections above quoted, we feel constrained to hold that the petitioner is not entitled under the Revenue Acts of 1917 and 1918, to include in invested capital, as paid-in surplus, intangibles acquired by way of gift.

By stipulation of the parties it is agreed that if the petitioner's contention, that intangibles paid in as a gift should be included in invested capital as paid-in surplus, is rejected by the Board, then the invested capital shown in the deficiency letter should be increased by the sum of $15,000, representing the actual cash value of the circulation paid in by the stockholders without consideration, provided the Board finds that newspaper circulation is tangible property.

The term circulation, as used in newspaper publishing businesses, comprehends something much broader than what may be characterized as mere subscription lists. As a practical matter it appears to be rather difficult to distinguish it from good will. It possesses many of the attributes of good will, and yet comprises other elements not common to the latter. It comprehends, on the one hand, a body of subscribers whom experience has demonstrated may be relied upon with some degree of certainty to continue to take and renew their

subscriptions to the paper in the future. On the other hand, it includes within its scope an established advertising clientele who use the paper as a medium by which to reach the purchasing public. The paper assembles the individuals constituting the public in such a way that the advertiser can reach them by one announcement. Hence, what the advertiser buys is the privilege of addressing the people assembled by the paper. Quantity and quality of the circulation are the determinative factors in establishing the advertising rates of a newspaper. Quantity as expressed in units; quality as denoting not only the character of the readers whom it attracts, but also the editorial and advertising policies of the paper, and the extent to which the subscribers are concentrated within the retail trading radius. By editorial policy is meant not only the political bias of the paper, but the broad treatment of news, whether sensational, moderate or conservative; the scope of the paper's appeal, whether to the masses or a class; and similar policies which go to make up a paper's individuality. The rate the advertiser pays is not based, fundamentally, upon the space he uses, but upon the circulation back of that space.

Circulation, in reality, is the very foundation upon which a newspaper publishing business is built. It is always a matter of first importance in the purchase and sale of a newspaper publication. It is often the subject of barter and sale, and may be transferred separately from the remainder of the business. It is now the subject of a systemized audit conducted by an audit bureau, whose membership is made up of owners of newspaper publications. We think that in its important characteristics it is so closely related to good will that it must be included as " other like property " within the definition of intangible property as laid down in section 325(a) of the Revenue Act of 1918. Accordingly, we must approve the Commissioner's action in refusing to allow a paid-in surplus, for invested capital purposes, in respect of the circulation and good will, formerly the property of the Decatur Evening Republican, paid in to the petitioner by its stockholders without consideration therefor.

The third question is whether the Commissioner is correct in reducing the invested capital for the taxable year 1919 by the amount of the income and profits-tax liability for the years 1917 and 1918. Since the adjustment of invested capital as made by the Commissioner is in conformity with the provisions of the regulations in force in respect of the year 1919, the appeal, so far as it pertains to this proposition, must be denied in accordance with the provisions of section 1207 of the Revenue Act of 1926.

The fourth question is whether the petitioner took a deduction, in computing its net income for the taxable year 1917, of $628.73, representing the income-tax liability in respect of the year 1916. It

is noted from the deficiency letter that while the Commissioner has found a deficiency in respect of the year 1917, he does not propose to assert the same, as the statute of limitations has run and now bars its assessment. Therefore, this Board is without jurisdiction to consider and decide the question here raised. However, it should be pointed out that the Commissioner has stipulated that the petitioner did not make such a deduction in computing its net income for the taxable year 1917.

The remaining question for decision is whether the petitioner realized a taxable profit upon the sale of its assets and business in 1920. The Commissioner, in the deficiency letter, computed a taxable profit upon the transaction of $28,398.13. The Commissioner's computation is set out in our findings of fact. It will be noted from that computation that the Commissioner has determined the March 1, 1913, value of the intangibles plus the cost of subsequent additions to be $112,163.72, and that the book value of the assets classified by the Commissioner as intangibles was, at the date of sale, $157,586.17. Throughout the computation the Commissioner has treated circulation structure and archives as intangible property. The March 1, 1913, value of intangibles was determined by the Commissioner by deducting from the average earnings of the five years next preceding 1913 an amount equivalent to 8 per cent of the average tangibles for the same period, and capitalizing the remainder at the rate of 15 per cent. The Commissioner stipulated that the cost of additions to circulation structure which were made subsequent to March 1, 1913, was $13,852.56 rather than $9,614.86, as shown in his computation, and that proper adjustment should be made to correct this error. The Commissioner stipulated further that the cost to petitioner of its circulation structure to March 1, 1913, was $76,218.95. Both parties agree that the basis for the determination of any gain or loss from this transaction should include the amount of any overpayments by the petitioner of income and profits taxes for the years 1917 to 1919, inclusive, and that the consideration or selling price will be affected by any change in the Commissioner's determination of the income and profits-tax liability of the petitioner for the year 1919 and the two-month period ended February 29, 1920.

The first contention of the petitioner is that in the determination of the March 1, 1913, value of its intangibles the Commissioner should not have resorted to an arbitrary formula when other and better evidence of such value was available. Several witnesses testified during the hearing as to the character of the intangible properties owned by this petitioner at March 1, 1913, their relation to the petitioner's business and their importance and great value in the conduct thereof. Only one expressed an opinion as to the fair market value

of these properties at March 1, 1913. This witness had been connected with the petitioner, in some capacity not disclosed to us, from 1912 to 1920, when the business was sold. He estimated the March 1, 1913, values of the petitioner's intangible properties to be as follows: Circulation structure, $76,000 to $100,000; Associated Press membership, more than $10,000; good will, $25,000 or more; and contract with Review Publishing Co., dated August 23, 1899, $18,000 to $20,000. He also expressed an opinion that the March 1, 1913, value of the petitioner's archives (morgue) was about $15,000. Another former employee of the petitioner testified that in his opinion $12,000 would represent a conservative value for the archives at March 1, 1913.

The next contention of the petitioner is that, if the formula used by the Commissioner for computing the March 1, 1913, value of intangibles is approved and adopted by the Board, the rate of 15 per cent used by the Commissioner for capitalizing the earnings, in excess of a return of 8 per cent on the net tangibles, is too high. However, the petitioner produced no evidence in support of this contention. During the oral argument counsel for petitioner asked us to adopt a rate of 12.42 per cent in lieu of the 15 per cent rate used by the Commissioner. Said rate of 12.42 per cent was computed by the petitioner in the following manner:

| | |
|---|---:|
| Net tangible assets at date of sale, as computed by the Commissioner | $126,631.46 |
| Average earnings for five-year period preceding date of sale | 27,609.94 |
| Less: 8% on net tangibles | 10,130.52 |
| Earnings attributable to intangibles | 17,479.42 |
| Total consideration received for assets, as determined by Commissioner | 267,193.31 |
| Less: Net tangibles as shown above | 126,631.46 |
| Consideration received for intangibles | 140,561.85 |
| Percentage that $17,479.42 bears to $140,561.85 | 12.42 |

The computation is based upon an assumption that the tangible assets were purchased in 1920 by the vendee at their book value, while the intangibles were purchased at a value based upon a capitalization of excess earnings on the basis of an eight-year purchase. These are assumptions which the petitioner has not established, by any competent evidence, to have been the actual facts. Further, we have no reason to believe that a willing purchaser would have purchased these intangibles at March 1, 1913, upon the same basis on which they were sold in 1920.

Speaking now in respect of the petitioner's contract with the Review Publishing Co., dated August 23, 1899, upon which one of the petitioner's witnesses placed a value at March 1, 1913, of

$18,000 to $20,000, we are of the opinion that that contract had no value at that date which should be included in the basis for the determination of the gain or loss realized by the petitioner upon the sale of its assets in 1920. The Review Publishing Co. was bound by its covenants for a period of but one year; hence, the life of the contract, so far as it conferred any benefits upon the petitioner, did not extend beyond that period. At any rate the contract had expired six years before the petitioner sold its business in 1920; hence, this contract could not have been one of the assets conveyed to the purchaser in 1920, and no part of the purchase price received for the business can be deemed to have been consideration for the contract.

We think from the evidence before us that the value which the Commissioner has placed upon the intangibles at March 1, 1913, to wit, $102,548.86, represents the fair value of the circulation, good will, and Associated Press franchise at that date, and that such value was properly used by the Commissioner in the determination of the gain or loss on this transaction.

From the evidence before us we find that the value of the archives at March 1, 1913, was not less than $12,000. The archives are tangible property and the Commissioner erred in treating them as intangible property for the purpose of the computation.

> *Order of redetermination in accordance with the foregoing findings of fact and opinion will be entered on 15 days' notice, under Rule 50.*

GREEN, SMITH, and TRUSSELL dissent.