CUSHMAN CHUCK CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7812, 11480.   Promulgated September 22, 1927.

1. Redetermination of profits taxes under section 328, Revenue Act of 1918 denied.

2. Redetermination under section 328, Revenue Act of 1918, of profits taxes determined under section 326 of said Act granted for the years 1919 and 1920.

*Barry Mohun, Esq.,* for the petitioner.
*A. George Bouchard, Esq.,* for the respondent.

These appeals are from deficiencies in taxes asserted by the respondent against the petitioner for the years 1918, 1919, and 1920 amounting, respectively, to $46,678.95, $27,846.51, and $26,608.56. The two appeals were consolidated for hearing.

The petitioner alleges that the respondent erred in determining the former's profits taxes for the year 1918 under section 327 and 328 of the Revenue Act of 1918 in that he failed both to select representative corporations and to employ the ratio between the average tax and the average net income of corporations selected as required by section 328 (a) (b) of the Revenue Act of 1918, and also in that he refused to allow the petitioner the benefit of assessment under sections 327 and 328 in the computation of its taxes for the years 1919 and 1920.

### FINDINGS OF FACT.

Petitioner's entire business consists of the manufacture of lathe chucks, face plate jaws, and drill chucks. Less than 2 per cent consists in the making of drill chucks. The lathe chuck was invented by John Fairman, whose daughter Harriet was the wife of Austin F. Cushman. Cushman learned his trade as a mechanic before specialization became a necessity. In 1862 he borrowed money of Samuel Woodruff with which he bought a lathe. This he rigged with foot power and set up in a hall bedroom of his tenement in the City of Hartford, Conn., and there worked from 10 to 15 hours a day making lathe chucks 3 or 4 inches in diameter, which he took to New York City in dozen lots and sold. In four years he was employing in the business approximately five journeymen mechanics and as many boys. In 1881 the number of employees had increased to approximately 24 men and the annual output of the factory to $25,000. Both of these doubled during the ensuing 4 years and the net profits at that time were at least 25 per cent of the gross income.

In 1885 Austin F. Cushman and his son, Eugene L., incorporated the business as Cushman Chuck Co., under the laws of Connecticut, with a capital stock of $80,000, divided into 800 shares, of which the two Cushmans took 799 and had one share issued to Adrian P. Sloan, superintendent of the Cushman Company shops, to enable him to hold the office of director, and thus complete the organization. Payments in full were made for all the stock—25 per cent in cash, 62½ in tangible property of a cash value equal to the par value of the stock and six letters patent of an ascertained actual cash value of at least $10,000. The total number of shares has not been changed since the organization of the company. The factories and office of the corporation are at Hartford.

The incorporation did not produce any change in the conduct of the business. No stockholders' or directors' meetings were held and the founder continued to direct all the activities of the business as fully as he had previously done. But, while Adrian P. Sloan performed no active duties as director, he was given full opportunity to increase the output and salability of the manufactured articles. To this end, he made numerous labor-saving improvements in the machinery. Some of these were patentable, but no patents were applied for. The management kept the inventions as trade secrets.

Like, and more notable, benefits were derived from the inventions of Harry E. Sloan, son of Adrian, who was employed in the factory when a school boy during vacations and remained there after com-

pleting his school work. In 1902 he became foreman of the gear and scroll department, employing approximately 50 men. In 1915 he was promoted to the position of superintendent of the factory, and is now vice president of the corporation. About 1905, he invented a jaw-slotting machine which produced an annual saving to the company of approximately $2,500 per year. Within a dozen years, he had added four other inventions which, with the first, produced an annual saving in labor and better product of approximately $98,500 per year. None of these were patented nor was application made for patents for any of them.

The elder Cushman died in 1914. Beginning some 20 years prior to his death, he had at sundry times promised Adrian P. Sloan that he would provide in his will a substantial bequest of stock in recognition of the latter's services on behalf of his employers. But it was discovered after his death that he had left no will. His son, Eugene L. Cushman, inherited all his property. Mr. Sloan then brought the matter to the attention of the son, with the result that the latter transferred to him 100 shares and to Harry E. Sloan 25 shares of the capital stock. These shares had at the time an earning capacity of approximately $85 each per year and an actual value of at least $500 each.

The respondent determined petitioner's excess-profits taxes for 1918 by the use of comparatives, under the requirements of sections 327 and 328 of the Revenue Act of 1918, and for 1919 and 1920 under section 301 of that Act. The petitioner alleges that because of the inability of the respondent to determine its invested capital as provided in section 326, he should have determined its profits taxes for 1919 and 1920 under the provisions of section 328 of the Act, and also that he used inapplicable comparatives in determining such taxes for 1918. It further alleges that there are but three companies in the United States which meet the requirements for such comparatives and that these three are the Skinner Chuck Co. of New Britain, Conn., the Westcott Chuck Co. of Oneida, N. Y., and E. Horton & Son Co. of Windsor Locks, Conn.

The respondent has ascertained the invested capital and net income of the petitioner and the three certain companies proposed by the latter as comparatives and determined the profits taxes and the petitioner has computed therefrom the ratio of tax to net income of each to be as follows:

| Corporation | Invested capital | Net income | Profits taxes | Ratio of tax to net income |
|---|---|---|---|---|
| **1918** | | | | |
| Cushman Chuck Co | (1) | $593, 253. 93 | $371, 505. 82 | 62. 6 |
| Skinner Chuck Co | $579, 950. 58 | 128, 212. 41 | 53, 773. 88 | 41. 9 |
| Westcott Chuck Co | (1) | 154, 113. 29 | 88, 219. 77 | 57. 2 |
| E. Horton & Son Co | 357, 263. 49 | 98, 090. 31 | 47, 491. 17 | 48. 4 |
| **1919** | | | | |
| Cushman Chuck Co | 815. 291. 33 | 365, 428. 03 | 99, 914. 89 | 27. 3 |
| Skinner Chuck Co | 636. 048. 05 | 137, 909. 42 | 18, 945. 07 | 13. 7 |
| Westcott Chuck Co | 302, 932. 11 | 75, 910. 62 | 12, 800. 05 | 16. 9 |
| E. Horton & Son Co | (2) | | | |
| **1920** | | | | |
| Cushman Chuck Co | 684, 812. 62 | 195, 671. 57 | 39, 319. 12 | 20. 1 |
| Skinner Chuck Co | (3) | 17, 693. 70 | None. | None. |
| Westcott Chuck Co | (4) | (4) | (4) | None. |
| E. Horton & Son Co | (4) | (5) | None. | None. |

[1] Sec. 328 granted.  [2] Not determined.  [3] Not computed.  [4] No information.  [5] Loss.

The inventions made by Adrian P. and Harry E. Sloan increased the company's net earning capacity $100,000 per year and they were productive of approximately that amount during each of the years 1918, 1919, and 1920. · A comparison of the net income of the four companies for the three years involved is as follows:

| Company | Net income | Comparative percentage | Cushman Company's excess |
|---|---|---|---|
| **1918** | | | |
| Cushman | $593, 253. 93 | 100 | |
| Skinner | 128, 212. 41 | 21. 5 | $465, 041. 52 |
| Westcott | 154, 113. 29 | 25. 9 | 439, 140. 64 |
| Horton | 98, 090. 31 | 16. 5 | 495, 183. 62 |
| Skinner, Westcott, and Horton | 380, 416. 01 | | 212, 837. 92 |
| **1919** | | | |
| Cushman | 365, 428. 03 | 100 | |
| Skinner | 137, 909. 42 | 37. 8 | 227, 518. 61 |
| Westcott | 75, 910. 62 | 20. 8 | 289, 517. 41 |
| Horton | (1) | | |
| Skinner and Westcott | 213, 820. 04 | | 151, 607. 99 |
| **1920** | | | |
| Cushman | 195, 671. 57 | 100 | |
| Skinner | 17, 693. 70 | 9 | 177, 977. 87 |
| Westcott | (2) | | |
| Horton | (2) | | |

[1] Not determined.  [2] No information.

## OPINION.

LANSDON: With the exception of " Ratio of Tax to net income," " Comparative percentage " and " Cushman Company's excess," the tabulated statements in the findings of fact are all taken from exhibits submitted at the hearing and are the respondent's findings. Those relating to net income are not disputed and the petitioner uses them for illustrative purposes in its brief. They indicate very

clearly that the Cushman Company had an immense advantage over its three competitors named either in the production or the sale of its products, and probably in both. No suggestion has been made of any reason for this other than that it is due to the inventions made by the Sloans, and inferentially to the mechanical and executive ability of the Cushmans.

The trade secrets invented by the Sloans, while proven at the hearing to have been of great value, do not appear to have been assigned any value in the computation of the taxes, further than as they gave rise to the claim advanced by the petitioner, that the conditions affecting its capital and income were abnormal and that without the benefit of section 328 of the Revenue Act of 1918, this abnormality would " work upon the corporation an exceptional hardship evidenced by gross disproportion between the .tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328."

The reason for such abnormality is not far to seek. These secret processes were intangible property. Section 325(a), Revenue Act of 1918. They had a clearly defined actual value of at least $100,000 per year, and possessed such value for a number of years, and there was nothing to indicate that the margin of value was decreasing. True, the corporation's net income had decreased almost 39 per cent from 1918 to 1919 and more than 46 per cent from 1919 to 1920; but that of its direct competitors had decreased to such an extent that none of them had any excess-profits tax for the year 1920. It is not unreasonable to presume that without these inventions, its net income and that of these competitors would have been practically the same. The largest of these, the Skinner Company, had in 1920 a net income of $17,693.70. If the other two averaged $15,000, the total for the three would have been, say, $48,000, the total of the four companies $244,000, and the average $61,000, showing an advantage in net income of $135,000 in favor of the Cushman Company attributable to its trade secrets and other undisclosed causes, and an actual difference in its favor of $177,977.87 over its nearest competitor—more than ten to one.

This working capital forms no part of the corporation's invested capital within the comprehension of the statute. It has not been " paid in for stock." It is not " paid in or earned surplus," nor can it be claimed as " undivided profits," *Herald-Despatch Co.*, 4 B. T. A. 1096; *Shope Brick Co.*, 5 B. T. A. 1042; *J. M. and M. S. Browning Co.*, 6 B. T. A. 914. In *Herald-Despatch Co.*, at page 1105, we said:

It would be absurd construction indeed which would permit the inclusion in invested capital, under very arbitrary limitations, of intangibles paid in for a consideration, and at the same time permit the inclusion of intangibles paid in

as a gift to the full extent of their actual cash value. * * * Reading together subdivisions (a) (3) and (a) (4) of the sections above quoted, we feel constrained to hold that the petitioner is not entitled under the Revenue Acts of 1917 and 1918, to include in invested capital, as paid-in surplus, intangibles acquired by way of gift.

In *Shope Brick Co., supra*, we held the above quoted language controlling, and in the *Browning Company* case, at page 926, speaking of certain contracts acquired by that company, we said:

It may also be stated * * * that regardless of the value of the several contracts on January 2, 1915, the date they were acquired by the petitioner, it is not entitled to include that value or any part thereof in its invested capital for the year 1918. The contracts were paid in to the petitioner corporation by the Brownings without any consideration therefor except the nominal consideration of one dollar, and under the decision of this Board in the *Appeal of Herald-Despatch Co.*, 4 B. T. A. 1096, they may not be included in invested capital under section 326 (a) (3) of the Revenue Act of 1918.

It has cost the corporation nothing more than the small expense pertaining to the development of the devices and yet measured by its earning capacity, it is the largest asset or single line of assets the business possesses. As testified by the inventor of the principal improvements, now vice president of the corporation: "It gave us a jump on our competitors, and also was just simply vital to the business." According to this witness, the five principal inventions made by him saved the company in time and labor $98,500 per year. The minor inventions increased this amount to approximately $100,000. If this increased earning capacity could be considered as invested capital and used in the computation of the profits taxes it would result in a saving to the petitioner of approximately $36,000 in such taxes for the year 1919 and approximately $25,000 for 1920 if computed without benefit of comparatives. This abnormal condition works " upon the corporation an exceptional hardship " which should be eliminated if practicable by according to it the computation of its taxes by means of comparatives, as provided by section 328 of the Revenue Act of 1918.

The profits taxes for 1918 were computed by means of comparatives. As to what corporations were used as comparatives, neither the taxpayer nor the Board has any information. These taxes are 62.6 per cent of the net income. Whether this be excessive can not be determined from the facts before us. We know that for the Westcott Chuck Co., engaged in a like business, having a net income of approximately 26 per cent of that of the petitioner, the respondent computed a tax equal to approximately 24 per cent of that assessed against the petitioner—a rate of 62.6 per cent against the petitioner and 57.2 per cent against the other corporation. The seeming disparity may be due to differences in facts relating to comparatives necessarily used. We must and do impute to the respondent good

faith and therefore do not deem it just or proper to require that he ascertain again the accuracy of the facts on which he has based certain conclusions unless there be ample reasons submitted to warrant such requirement. In our opinion such reasons are not to be found in the record of this case.

The petitioner states that the three corporations, the Skinner Chuck Co., the Westcott Chuck Co., and E. Horton & Son Co., are the only companies in the United States, except the petitioner itself, engaged exclusively in the manufacture of chucks, and are therefore the only companies which properly can be used as comparatives under section 328 of the Revenue Act of 1918 and should be used as such. Admitting the facts to be as stated we are unable to agree with its conclusions, first, because the companies named are not proper comparatives for 1919 and 1920 or either of these years, and, second, because we deem it possible that there are other companies which may meet all the requirements of comparatives. We pause to consider the former of these reasons.

These comparatives are used only for the determination of excess-profits taxes; and such taxes when determined must bear the same ratio to the net income of the corporation for which they are determined as the average tax of the comparatives to their average net income. For the year 1920, the net income of the Cushman Chuck Co. was $195,671.57; that of its nearest proposed comparative was $17,693.70, not quite 9 per cent as great. As to the second nearest comparative we have no information and the third suffered an actual loss. None of these three paid any profits tax. Consequently the average tax to be considered under section 328 (a) was zero and the ratio of the tax to the net income of the three was as zero to an indeterminate amount, possibly more, possibly less than zero. The petitioner expresses it thus—

| | |
|---|---:|
| Westcott Chuck Co_____ | No information. |
| Skinner Chuck Co_____ | 00. 00 |
| E. Horton & Son Co_____ | 00. 00 |
| Average ratio of profits tax to net income of comparative corporations whose profits tax has been finally determined under section 301_____ | 00. 00 |

It is obvious from the evidence that the petitioner has shown only that the other three companies were in a similar business. The remaining factors of similarity required by the statute are absent. Clearly the gross income, the net income, profits per unit of business, and employed capital, are not comparable with those of the petitioner.

In view of the foregoing, judgment for the respondent will be entered for the year 1918. For the years 1919 and 1920 the petitioner has proved that it comes within the provisions of section 327

of the Revenue Act of 1918 and therefore is entitled to the computation of its tax liability for such years under the provisions of section 328 of the same Act.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice,*
> *under Rule 50.*

MILLIKEN: I concur in the result concerning the years 1919 and 1920 and dissent as to the decision concerning the year 1918.