Elizabeth Hanavan, Deceased, by LeRoy L. Smith and Mary Beston Smith as Sole Executors of her Last Will and Testament v. Commissioner.
Hanavan v. Commissioner
Docket No. 13.
United States Tax Court
1943 Tax Ct. Memo LEXIS 58; 2 T.C.M. (CCH) 1049; T.C.M. (RIA) 43480; November 12, 1943
*58 March 1, 1913 fair market value of decedent's stock in Long Island Star Publishing Company determined. George McKinley, Esq., 15 Williams St., New York, N.Y., for the petitioners. William F. Evans, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $220.63 and $8,418.51 in the decedent's income taxes for the year 1939 and 1940, respectively. The issues are: 1. The March 1, 1913 fair market value of shares of stock of the Long Island Star Publishing Company owned by the petitioner. 2. The proper method of computing gain on certain liquidating dividends. Findings of Fact Certain facts are stipulated and as so stipulated are adopted as findings of fact. They are as follows: The petitioners, LeRoy L. Smith and Mary Beston Smith, are the sole executors of the last will and testament of Elizabeth Hanavan, deceased. The taxpayer died on the 8th day of August, 1942, a resident of Forest Hills, Long Island, New York, leaving her last will and testament which was duly admitted to probate by the Surrogate's Court of Queens County, New York, and letters testamentary thereunder were duly issued by the said court on August *59 21, 1942 to the petitioners, and the petitioners are still acting as such executors. The books of the Long Island Star Publishing Company, hereinafter called the company or the corporation, show net earnings as follows: Year ended May 31, 1909
$11,063.21
Year ended May 31, 1910
9,693.53
Year ended May 31, 1911
6,170.78
Year ended May 31, 1912
4,497.39
Year ended May 31, 1913
14,534.20 In determining the earnings for the fiscal years 1909 to 1913, inclusive, no deduction was taken for depreciation on the building, plant, and equipment. The book value of the building at the end of the years ended May 31, 1908 and May 31, 1909 was $11,466.66 and at the end of the years ended May 31, 1910 and May 31, 1913 was $11,647.19. The value of the plant and equipment for the years ended May 31, 1908 to May 31, 1913, inclusive, was as follows: Year ended May 31, 1908
$44,136.76
Year ended May 31, 1909
46,757.68
Year ended May 31, 1910
50,436.11
Year ended May 31, 1911
50,610.74
Year ended May 31, 1912
51,508.71
Year ended May 31, 1913
51,933.03
The net tangible assets as shown by the books for the years ended May 31, 1908 to May 31, 1913, inclusive, were as follows: *60 Year ended May 31, 1908
$ 80,651.85
Year ended May 31, 1909
90,745.06
Year ended May 31, 1910
98,588.59
Year ended May 31, 1911
102,409.37
Year ended May 31, 1912
104,556.76
Year ended May 31, 1913
116,740.96
Elizabeth Hanavan, as president of the corporation, was paid a salary of $3,000 for the year ended May 31, 1909 and a salary of $6,000 for the years ended May 31, 1910, 1911, 1912 and 1913. The values in respect to corporation, the earnings, and other data herein referred to are of the same import and validity as of March 1 as shown on May 31 of the several respective years. There are no known sales of the corporation stock of such period and no quoted prices thereon. The record discloses the following additional facts: The decedent, Elizabeth Hanavan, filed her income tax returns for the years 1939 and 1940 with the collector of internal revenue for the first district of New York. On March 1, 1913 the decedent owned 268 shares out of a total of 312 outstanding shares of the company. Thereafter the company purchased the remaining 44 shares of its own stock. The sum of $271,880.99 was received by the decedent upon the liquidation of the company. At the time *61 of the liquidation she was the sole stockholder. For many years prior to her death she had been the chief stockholder and president of the company. The company's newspaper and printing plant was in Long Island City. The company published the Greenpoint Weekly, the Long Island Weekly Star and the Long Island Daily Star, whose circulations on March 1, 1913 were 3,000. 4,000, and over 7,000 copies, respectively. The plant consisted of a two-story and attic brick building erected in 1907 and appropriate printing equipment. It was specially designed for the purpose. The first, or press-room floor was of concrete, with large plate glass windows. A mezzanine floor contained the business office. The second floor was of wood and was supported by steel beams. It held several linotype machines, make-up tables, metal, supplies, etc. The attic was used for storage purposes. The plant was maintained in good working order. About three-fourths of it was used for job printing and remainder for publishing newspapers. No depreciation was taken on either the building or machinery prior to 1915. A proper charge for depreciation for the five years prior to the year ended March 1, 1913 was 3 per cent, *62 applicable to the building, and 5 per cent applicable to the machinery and equipment. The Long Island Weekly Star was established in 1865. The Daily was an outgrowth of the Weekly. On March 1, 1913 Long Island City was growing rapidly. The Star had an exclusive field extending from Flushing Creek to the East River and enjoyed a very promising outlook. The construction of the Long Island Tunnel had just been announced and other improvements were under way and in view. The Star had a good organization. From 1909 to 1913 the circulation grew more rapidly than previously thereto due to the improvements and the consequent influx of population. Considerable money was spent by the company to increase circulation but no entries were made on its books to reflect its circulation structure. A large part of the circulation of the Daily was derived from news stand sales while the circulation of the Weekly papers was largely by mail. The Daily printed only local news and hence was not disturbed by competition of the metropolitan dailies. The net earnings as shown on the books of the company for the respective years were as follows: Year ending:
May 31, 1914
$12,023.61
May 31, 1915
2,898.90
May 31, 1916
909.60
May 31, 1917
18,327.25
May 31, 1918
21,758.18
May 31, 1919
26,490.20
May 31, 1920
25,782.67
May 31, 1921
47,625.00
*63 In the year ended May 31, 1916 the company charged off depreciation amounting to $13,871.52 on the plant and equipment for prior years. The fair market value of the company's intangible assets on March 1, 1913 was $70,000. The fair market value of the decedent's stock on that date was 268/312ths of the sum of the company's net tangible assets, revised to reflect the depreciation rates above found, and its net intangible assets of $70,000. In his notice of deficiency the respondent determined that the fair market value of the 312 outstanding shares of the company's stock on March 1, 1913 was not in excess of $90,538.74 and hence that the value of the decedent's 268 shares thereof was not in excess of $77,772.78. He also held that there was no gain on the decedent's liquidating dividends until her capital investment was recovered and that when that should occur, subsequent distributions would constitute gain in their entirety, subject to the statutory capital gain provisions. Opinion VAN FOSSAN, Judge: The major issue is the determination of the fair market value of the decedent's stock in the Long Island Star Publishing Company on March 1, 1913. In the absence of other evidence, *64 we are obliged to resort to the value of the underlying assets. Section 113(a)(14), I.R.C. In this matter it is necessary to fix rates of depreciation on certain tangible assets and to find a value of the intangible assets. The petitioners contend that the correct fair market value of the company's net tangible assets on March 1, 1913 was $92,667.31 while the respondent calculated it to be $90.538.74. The difference arises solely from the depreciation rates employed. The respondent used a 10 per cent depreciation rate on machinery and equipment. We have found the proper rates to be 5 per cent. The respondent used a 3 per cent depreciation rate on the building, while the petitioners calculated the depreciation at 2 per cent. We have found that 3 per cent is the correct rate. The value of these assets will be computed accordingly. In computing the March 1, 1913 fair market value of the stock, the respondent assigned no value whatever to its net intangible assets. He argues that none existed. The ingredient of value known in newspaper parlance as "circulation structure" has long been recognized as a proper factor in evaluating a newspaper's assets. Mertens Law of Federal Income Taxation, *65 Vol. 10, sec. 59.91; Herald-Despatch Co., 4 B.T.A. 1096. We have no doubt that the company's intangible assets were of considerable value. The newspapers published by it obviously enjoyed the confidence and support of the community in which they were circulated. As is true in many localities, they grew with the neighborhood. The company was well managed and took good care of its physical assets. The prospect for increased circulation and added job printing was promising on March 1, 1913. The population of the community was increasing rapidly and the company had reason to anticipate increased prosperity and profits. The earnings subsequent to that date corroborate the trend toward greater profits. The demand for the Weekly newspapers did not keep pace with that for the Daily but the record reveals no diminution of earnings on that account. It is a common practice to value a newspaper's circulation structure at from $10 to $15 per unit. Daily Pantagraph, Inc. v. United States, 37 Fed. (2d) 783; Cooperative Publishing Co. v. Commissioner, 115 Fed. (2d) 1017. In this case we believe $10 *66 is a proper per unit value. The Daily Star had a circulation of over 7,000. Taking that figure as a basis and disregarding entirely the circulation of the two weekly papers and applying the value of $10 per unit, we arrive at $70,000 as the fair market value of the circulation structure on March 1, 1913. The fair market value on March 1, 1913 of the decedent's stock will be determined by taking 268/312ths of the sum of the company's net tangible assets, computed by applying the depreciation rates above found, and the net value of the intangible assets, $70,000. In the second issue no proof was introduced bearing on the question and, accordingly, we have no factual basis for the consideration of the same. We, therefore, affirm respondent's treatment for failure of proof. Decision will be entered under Rule 50