## APPEAL OF SHOPE BRICK CO.

Docket No. 6531.     Promulgated January 10, 1927.

1. The value of United States and Canadian patents paid in to a corporation for a consideration of $1 and $2, respectively, may not be included in invested capital under the Revenue Acts of 1918 and 1921 as a paid-in surplus.

2. March 1, 1913, value of patents determined.

*Frederick L. Pearce, C. P. A.* and *George M. Morris, Esq.,* for the petitioner.

*Thomas P. Dudley, Jr., Esq.,* for the Commissioner.

This is an appeal from the Commissioner's determination of a deficiency of $9,550.02 income and profits taxes for 1919, 1920 and 1921. The petitioner alleges that the Commissioner erred in refusing to allow a paid-in surplus for intangibles and in disallowing a deduction taken for exhaustion of patents, and that it is entitled to special assessment.

### FINDINGS OF FACT.

The petitioner is an Oregon corporation, having incorporated on April 13, 1911, under the name of Shope National Concrete Machinery Co. The name was changed to Shope Brick Co. on March 9, 1917, without other amendment to the original charter.

Prior to 1909, David F. Shope, residing in St. Paul, Minn., had been experimenting with a process for waterproofing brick and cement blocks. Having perfected his process and a machine to manufacture the new type of brick, he applied for letters patent. On July 19, 1910, he was issued United States Patent No. 965,027 for his machine, and on February 28, 1911, United States Patent No. 985,709 for his process. The cement brick machine puts into operation the method of waterproofing cement blocks covered by

the basic process, and the former patent is controlled by the latter. Shope also applied for and was issued Canadian letters patent on December 29, 1911, for the machine and on November 19, 1912, for the process. The life of a Canadian patent is 6 years, with the privilege of renewal for a further term of 12 years, or a total life of 18 years.

At incorporation, stock in the amount of $4,961—4,961 shares of $1 par value—was issued for the tangible assets of Shope's brick business in Portland, Oreg. Shope received 10 shares, his wife 4,950 shares, and Robert H. Downes one share.

At the date of incorporation Shope assigned his two United States patents to the corporation for a cash consideration of $1, no stock being issued therefor. The assignments were recorded in the United States Patent Office on May 15, 1911. Thereafter Shope assigned his Canadian patent applications to the corporation for a cash consideration of $2. The assignment dates of the two applications for patent were July 21, 1911, for the machine, and February 1, 1912, for the process.

Sales of territorial rights made in the years 1909 to 1913, inclusive, by either Shope or the petitioner under the Shope patents, are as follows:

| Date. | United States Territory. | Sales price. |
| --- | --- | --- |
| Jan. 16, 1909 | Milwaukee County, Wisconsin | $2,250 |
| Oct. 12, 1909 | Spokane County, Washington | 1,500 |
| Nov. 8, 1909 | Pierce County, Washington | 3,750 |
| Sept. 27, 1913 | Wayne and Washtenaw Counties, Mich | 2,500 |
| Feb. 7, 1914 | San Francisco, San Mateo, Santa Clara, Alameda, Contra Costa Counties, California. | 8,500 |
|  | Total | 18,500 |
|  | Canadian Territory. | |
| March 20, 1913 | Vancouver, B. C | 1,321.55 |
| April 9, 1913 | Kamloops, B. C | 400.00 |
| May 5, 1913 | Parts of Saskatchewan and Alberta | 2,600.00 |
| May 20, 1913 | Prince Rupert, B. C | 800.00 |
| June 17, 1913 | (2) Electoral Dists. B. C | 3,600.00 |
|  | Total | 8,721.55 |

Sales of territorial rights under the Shope patents during 1919, 1920 and 1921 were as follows:

| | |
| --- | --- |
| 1919 | $33,404.45 |
| 1920 | 41,701.83 |
| 1921 | 48,862.77 |

The sales of territory were made by Shope, and, after incorporation, by the petitioner, upon a certain well defined basis. Shope could produce brick at a saving of $10 per thousand and it was sold at practically the same prices as brick of similar quality. He figured that a new Shope brick plant should do a minimum of 10 per cent of

the normal business in the territory during its first year of operation. By multiplying 10 per cent of the face brick consumed within the territory for the preceding year by $10 a thousand, the saving by his process to the manufacturer, he arrived at the price at which he sold the territory. This method of arriving at a sales price has been consistently followed. The experience of the company has been that the actual sales of the licensees reach 10 per cent of the territory. The expenses and overhead in selling the territorial rights amounted to approximately 30 per cent of the sale price.

The Shope machine was made by contract at a cost of $75. A certain number of machines were sold with each territory. Additional machines could be secured at prices of $175, $200 or $250 each, according to the contracts of sale of the various territories. The Shope machine had an annual capacity of 375,000 bricks, computed upon a basis of 1,500 bricks per day and 250 working days per year. The machine was simple to operate and the work could be done by common labor. The product was a high class face brick that would resist moisture and not absorb it. The bricks were made in 115 sizes and in various colors and shades.

The value of the United States patents on April 13, 1911, was $5,250; on March 1, 1913, it was this value less depreciation for the period from April 13, 1911, to March 1, 1913. The value of the Canadian patents on March 1, 1913, was $6,105.08.

The amount allowed by the Commissioner for paid-in surplus resulting from the donation to the petitioner of the two United States patents at the date of incorporation is $1,240. He allowed no amount for paid-in surplus for the two Canadian patents. A March 1, 1913, value was allowed for the United States patents and no value as of that date for the Canadian patents. No allowance for exhaustion of the United States patents was made in determining taxable net income for 1919, but a deduction of $83 was allowed in each of the years 1920 and 1921 for such exhaustion. No allowance for exhaustion of the Canadian patents was made for any of the years in question.

OPINION.

MORRIS: At the hearing petitioner withdrew its claim for special assessment, leaving two questions for our consideration, first, whether, under section 326 of the Revenue Acts of 1918 and 1921, petitioner is entitled to a paid-in surplus on the United States and Canadian patents in computing invested capital, and, if so, the amount thereof; and, second, the value, if any, on March 1, 1913, of those patents for exhaustion purposes. In connection with the first point, the Commissioner raised the question at the hearing whether it was proper for him to have included a paid-in surplus

of $1,240, resulting from the turning in of the two United States patents to the petitioner at the date of incorporation.

Under section 325 of the Revenue Acts of 1918 and 1921, patents are intangible property. We have previously considered the question whether, under the Revenue Acts of 1917 and 1918, intangibles acquired by way of gift may be included in invested capital as paid-in surplus in the *Appeal of Herald-Despatch Co.*, 4 B. T. A. 1096. In that case we held:

> It seems clear to us, however, that in providing for the inclusion in invested capital of intangibles paid in for stock or shares, subject to very specific and arbitrary limitations, Congress intended to exclude intangibles paid in as a gift. It would be absurd construction indeed which would permit the inclusion in invested capital, under very arbitrary limitations, of intangibles paid in for a consideration, and at the same time permit the inclusion of intangibles paid in as a gift to the full extent of their actual cash value.

As there is no difference between the Revenue Acts of 1921 and 1918 so far as the question under consideration is concerned, that decision is controlling here. The petitioner may not therefore include in invested capital as a paid-in surplus the value of the patents in question, and the Commissioner was in error in including the amount of $1,240 in invested capital as a paid-in surplus for the United States patents.

The petitioner has submitted two methods of computation of the values of the patents at the date turned in and at March 1, 1913, which, being based on anticipated profits and other assumptions, are of little use. The mere stating of them seems to us to be sufficient to show how inherently fallacious the computations and resulting values are. In the first method, the petitioner took the population of the territories sold at the time the patents were paid in and found that it represented .6 of 1 per cent of the total population of continental United States. These territorial rights were sold for $7,500. By multiplying this amount by $\frac{100}{.6}$ the petitioner found that the sale of rights in the balance of continental United States would bring $1,250,000, which was reduced by 30 per cent, representing selling cost and overhead, to $875,000. Discounting the latter amount for the life of the patents by Hoskold's formula, using 8 and 4 per cent, a net value on April 13, 1911, of $421,225 was arrived at. The March 1, 1913, value was computed by the same method and a net value of $265,734 was reached. The Canadian patents were computed for each of the dates as having a net value of $35,919.

The second method consisted of taking the face brick production in the United States in 1911, assuming that the petitioner would produce one-tenth of the face brick produced therein, and multiplying that one-tenth by $7, the difference between the saving of $10

per thousand in the manufacture of its brick, and $3, which represented selling cost and overhead. Petitioner computed this to be $510,937 and, by using Hoskold's formula, as above, arrived at a net value on April 13, 1911, of $245,965. A like computation for value on March 1, 1913, of the United States patents gave a total of $279,214. In the computations, population and production estimates were secured from publications of the Census Bureau, United States Department of Commerce.

What we said in *Appeal of Gamon Meter Co.*, 1 B. T. A. 1124, 1131, is particularly applicable:

It appears from the evidence that the valuation * * * for the patents at the time paid in was predicated to a considerable extent upon future hopes and not altogether upon what the patents were actually worth in cash at that time. The experience of the men interested in the patents perhaps justified their belief that they would ultimately prove successful and result in large earnings, but the Revenue Act contemplates a cash value at the time the patents are paid in.

If the patents are to be valued as of March 1, 1913, the Revenue Act contemplates a cash value at that time.

Undoubtedly the patents were valuable. Any higher value, however, than that set forth in our findings of fact would be merely speculative and prospective. We have used the actual sales of territorial rights in arriving at our determination, which seems to us to be the only conclusion warranted by the record. Prior to April 13, 1911, the only sales made were the three in 1909, amounting to $7,500, which reduced by 30 per cent, representing selling expenses and overhead, gives an amount of $5,250 which we consider the only evidence of value attributable to the patents as of that date. As there were no sales from 1909 until the latter part of 1913, the value of the patents on April 13, 1911, depreciated to March 1, 1913, is taken as the value on the latter date. The March 1, 1913, value of the Canadian patents, which we find to be $6,105.08, represents the sales of Canadian territory less 30 per cent for selling expenses and overhead. In our opinion, the Canadian sales set forth in the findings of fact are close enough to March 1, 1913, to be indicative of value as of that date. The petitioner is entitled to exhaustion, therefore, for the taxable years in question on the March 1, 1913, value of the patents above set forth. The life of the patents should be computed from the date of the process patents for the reason that, although the machine patents would expire some months prior to the process patents, the machine by itself is of little value without the process.

*Judgment will be entered on 15 days' notice, under Rule 50.*