## APPEAL OF J. M. AND M. S. BROWNING CO.

Docket No. 1037.   Promulgated April 19, 1927.

1. License agreements for the use of patents are intangible property. The right to receive royalties thereunder is likewise intangible property and when paid into a corporation for a nominal consideration can not be included in invested capital under section 326(a)(3) of the Revenue Act of 1918.

2. The fair market value as of January 2, 1915, of the right to receive royalties under certain license agreements, and the manner of computing the deduction for the exhaustion thereof, determined.

3. The petitioner accepted a lump sum in lieu of the royalties which would be payable under contracts owned by it. *Held*, that the amount so received constituted income.

4. Under the facts herein the petitioner is entitled to special assessment.

*Leo H. Hoffman, Esq.*, and *Forest D. Siefkin, Esq.*, for the petitioner.

*A. H. Fast, Esq.*, for the Commissioner.

(1) The value on January 2, 1915, of certain contracts acquired by the petitioner on that date from J. M. and M. S. Browning.

(2) The amount of the allowance, if any, to which the petitioner is entitled for the year 1918 on account of exhaustion or obsolescence of the contracts acquired on January 2, 1915, from J. M. and M. S. Browning.

(3) Whether or not the amount of $750,000 received by the petitioner in the year 1918, as payment for the relinquishment by it of its right to royalties under the contracts mentioned, was taxable income.

(4) Whether or not the petitioner is entitled to have its tax liability for the year 1918 computed under sections 327 and 328 of the Revenue Act of 1918, and if it is entitled to have its liability so computed, what comparatives should be used.

### FINDINGS OF FACT.

(1) The petitioner is a corporation organized in the year 1908 under the laws of Utah, with its principal office at Salt Lake City. It is an investment company and its activities have at all times consisted solely in holding stocks, bonds, real estate, notes receivable, depositing accounts, special accounts and savings accounts, receiving and investing the income from the property so held, and receiving royalties on certain contracts hereinafter referred to. The capital stock of the corporation is and was during the years involved herein, closely held, being owned by members of the Browning family.

J. M. Browning and M. S. Browning were stockholders of the corporation and were also president, and general manager and secretary, respectively.

(2) On January 2, 1915, J. M. Browning was and had been for many years, an inventor of automatic firearms. At that time, he and his brother, M. S. Browning, were the owners of numerous patents covering automatic pistols, machine guns and other automatic firearms, invented by J. M. Browning, the use of which patents had been granted to certain manufacturers of firearms upon a royalty basis. On January 2, 1915, J. M. and M. S. Browning assigned to the petitioner their rights to royalties under certain contracts by the following instrument:

JANUARY 2, 1915.

### ASSIGNMENT OF AGREEMENT.

In consideration of One Dollar, we hereby assign and transfer to the J. M. and M. S. Browning Company all contracts between ourselves, or either of us, made with the Colts Patent Firearms Mfg. Company, Remington Arms Company or their successors, J. Stevens Arms and Tool Company, Fabrique Nationale d'Armes de Guerre, or their successors, for the payment of royalties on patents.

J. M. BROWNING
M. S. BROWNING.

The contracts covered by the assignment set forth were as follows:

Contracts with the Colts Patent Fire Arms Manufacturing Co., hereinafter called the Colts Company.

> (a) Contract dated July 24, 1896 (Exhibit A–1)
> (b) Contract dated January 11, 1902 (Exhibit A–2)
> (c) Contract dated April 6, 1903 (Exhibit A–6)
> (d) Contract dated November 13, 1899 (Exhibit A–7)

Contracts with the Remington Arms Co., hereinafter called the Remington Company.

> (a) Contract dated December 23, 1903 (Exhibit A–8)
> (b) Contract dated June 11, 1904 (Exhibit A–9)
> (c) Contract dated March 20, 1914 (Exhibit A–10)
> (d) Contract dated August 6, 1914 (Exhibit A–11)

Contracts with the Fabrique Nationale d'Armes de Guerre, Societe Anonyms, hereinafter called the Belgian Company.

> (a) Contract dated July 7, 1897 (Exhibit A–12)
> (b) Contract dated December 8, 1903 (Exhibit A–13)
> (c) Contract dated January 4, 1913 (Exhibit A–14)
> (d) Contract dated July 29, 1909 (Exhibit A–15)

Contracts with the J. Stevens Arms & Tool Co.

> (a) Contract dated June 12, 1906 (Exhibit A–16)
> (b) Contract dated November 10, 1913 (Exhibit A–17)

These contracts were all similar in that they gave the rights to the several companies to manufacture and sell certain of the many

patented firearms invented by J. M. and M. S. Browning. They also, with one exception, gave to the various companies, the use of any and all improvements which might be made by J. M. and M. S. Browning on the particular arms covered by their respective contracts. The exception existed in the case of the contracts with the J. Stevens Arms & Tool Co. Its contract dated June 12, 1906, (Exhibit A-16) was modified by the contract of November 10, 1913, (Exhibit A-17) so as to exclude therefrom the rights to inventions thereafter made. These contracts, with the exception of the contract with the J. Stevens Arms & Tool Co., were for the life of the patents set forth therein, and of any patents that might thereafter be granted to J. M. and M. S. Browning for improvements on the inventions covered by the existing patents.

(3) The contracts (Exhibits A-1 and A-2) between J. M. Browning and M. S. Browning, of the one part, and the Colts Company of the other part, dated July 24, 1896, and January 11, 1902, gave the exclusive right to the Colts Company to manufacture, use, and sell certain automatic pistols invented by J. M. and M. S. Browning, and all improvements thereafter made on such automatic pistols, in consideration of certain royalties to be paid on the pistols manufactured and sold. The contracts covered the following arms:

> .380 caliber automatic pistol
> 45 caliber automatic pistol
> 38 caliber automatic pistol
> 32 caliber automatic pistol
> 25 caliber automatic pistol
> 22 caliber automatic pistol

The patents which had been granted prior to January 2, 1915, and which were covered by the contracts of July 24, 1896, and January 11, 1902, (Exhibit A-1 and A-2) were:

| Number. | Dated. | Number. | Dated. |
|---|---|---|---|
| 580, 923 | April 20, 1897 | 747, 585 | December 22, 1903 |
| 580, 924 | April 20, 1897 | 808, 003 | December 19, 1905 |
| 580, 925 | April 20, 1897 | 818, 739 | April 24, 1906 |
| 580, 926 | April 20, 1897 | 947, 478 | January 25, 1910 |
| 621, 747 | March 21, 1899 | 984, 519 | February 14, 1911 |
| 708, 794 | September 9, 1902 | 1, 070, 582 | August 19, 1913 |

The royalties paid on the contracts of July 24, 1896, and January 11, 1902, for the years 1908 to 1921, inclusive, were:

| | | | |
|---|---|---|---|
| 1908 | $9, 539. 67 | 1915 | $43, 690. 29 |
| 1909 | 13, 486. 75 | 1916 | 71, 666. 55 |
| 1910 | 14, 490. 70 | 1917 | 88, 198. 79 |
| 1911 | 15, 743. 34 | 1918 | 272, 697. 86 |
| 1912 | 30, 310. 31 | 1919 | 83, 483. 10 |
| 1913 | 49, 256. 90 | 1920 | 49, 483. 10 |
| 1914 | 47, 739. 16 | 1921 | 22, 640. 75 |

(4) The contract (Exhibit A–6) between J. M. and M. S. Browning and the Colts Company, dated April 6, 1903, gave the Colts Company the exclusive right to manufacture, use, and sell certain machine guns invented by J. M. and M. S. Browning, and all improvements that might thereafter be made on such machine guns, in consideration of certain royalties to be paid on the arms manufactured and sold. The patents covered by this contract were:

| Number. | Dated. | Number. | Dated. |
|---|---|---|---|
| 471,782 | March 29, 1892 | 544,658 | August 20, 1895 |
| 471,783 | March 29, 1892 | 544,659 | August 20, 1895 |
| 471,784 | March 29, 1892 | 544,660 | August 20, 1895 |
| 502,549 | August 1, 1893 | 544,661 | August 20, 1895 |
| 543,567 | July 30, 1895 | 678,937 | July 23, 1901 |
| 544,657 | August 20, 1895 | | |

Application No. 125,504, dated October 13, 1916, was made for an improved machine gun and a patent, No. 1,293,021, was issued thereon on February 4, 1919. Application No. 183,841, for a patent on a machine gun rifle, was made on August 1, 1917, and a patent, No. 1,293,022, was issued on February 4, 1919. These patents fell within the provisions of the contract of April 6, 1903 (Exhibit A–6).

The royalties paid on the contract of April 6, 1903, (Exhibit A–6) during the years 1908 to 1921, inclusive, were as follows:

| | | | |
|---|---|---|---|
| 1908 | $450.00 | 1915 | $140,265.00 |
| 1909 | 360.00 | 1916 | 638,910.00 |
| 1910 | 1,170.00 | 1917 | 366,120.00 |
| 1911 | 2,385.00 | 1918 | 3,105.00 |
| 1912 | 2,115.00 | 1919 | 1,215.00 |
| 1913 | 3,555.00 | 1920 | 2,685.00 |
| 1914 | 16,380.00 | 1921 | 2,550.00 |

(5) The contract (Exhibit A–7) dated November 13, 1899, between J. M. and M. S. Browning, and the Colts Company, gave the Colts Company the exclusive right to manufacture, use, and sell a belt loader for machine guns invented by J. M. and M. S. Browning, and to all improvements that might thereafter be made on such belt loader, in consideration of certain royalties to be paid on the loaders manufactured and sold. The patents on the belt loader had not been granted at the time the contract was entered into, but an application had been made for a patent thereon, and it was issued on October 23, 1900, being Patent No. 660,244. The royalties paid during the years 1908 to 1917, inclusive, on the contract of November 13, 1899, (Exhibit A–7) were:

| | | | |
|---|---|---|---|
| 1908 | $70.00 | 1913 | $240.00 |
| 1909 | None. | 1914 | 985,00 |
| 1910 | 40.00 | 1915 | 8,635.00 |
| 1911 | 150.00 | 1916 | 38,233.75 |
| 1912 | 310.00 | 1917 | 45,618.75 |

(6) The contract (Exhibit A–8) between J. M. and M. S. Browning, and the Remington Company, dated December 23, 1903, gave the Remington Company the exclusive right to manufacture, use, and sell certain automatic shotguns invented by J. M. and M. S. Browning, and all improvements thereafter made on such automatic shotguns, in consideration of certain royalties to be paid on the arms manufactured and sold. The patents which had been granted prior to January 2, 1915, and which were covered by the contract of December 23, 1903, were as follows:

| Number. | Dated. |
|---|---|
| 659, 507 | October 9, 1900 |
| 689, 283 | December 17, 1901 |
| 710, 094 | December 30, 1902 |
| 730, 870 | June 16, 1903 |
| 812, 326 | February 13, 1906 |

The royalties paid on the contract of December 23, 1903, (Exhibit A–8) during the years 1908 to 1921, inclusive, were:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1908 | $19, 375. 13 | 1915 | $16, 573. 89 |
| 1909 | 23, 584. 66 | 1916 | 12, 980. 99 |
| 1910 | 25, 714. 54 | 1917 | 19, 647. 03 |
| 1911 | 23, 995. 53 | 1918 | 18, 179. 32 |
| 1912 | 21, 592. 51 | 1919 | 26, 060. 98 |
| 1913 | 21, 293. 26 | 1920 | 104, 489. 89 |
| 1914 | 15, 759. 10 | 1921 | 41, 970. 05 |

(7) The contract (Exhibit A–9) between J. M. and M. S. Browning, and the Remington Company, dated June 11, 1904, gave the Remington Company the exclusive right to manufacture, use, and sell certain automatic rifles invented by J. M. and M. S. Browning, and to all improvements thereafter made on such automatic rifles, in consideration of certain royalties to be paid on the arms manufactured and sold. The patents which had been granted prior to January 2, 1915, and which were covered by the contract of June 11, 1904, (Exhibit A–9) were as follows:

| Number. | Dated. | Number. | Dated. |
|---|---|---|---|
| 659, 507 | October 9, 1900 | 701, 289 | July 3, 1902. |
| 659, 786 | October 16, 1900 | 853, 438 | May 14, 1907. |
| 701, 288 | July 3, 1902. | 984, 263 | February 14, 1911. |

The royalties paid during the years 1908 to 1921, inclusive, on the contract of June 11, 1904, (Exhibit A–9) were:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1908 | $4, 665. 20 | 1915 | $2, 064. 59 |
| 1909 | 4, 673. 12 | 1916 | 2, 521. 20 |
| 1910 | 4, 857. 04 | 1917 | 2, 345. 46 |
| 1911 | 4, 817. 80 | 1918 | 2, 653. 32 |
| 1912 | 3, 695. 10 | 1919 | 2, 890. 66 |
| 1913 | 3, 055. 27 | 1920 | 9, 246. 65 |
| 1914 | 2, 439. 98 | 1921 | 3, 453. 50 |

(8) The contract (Exhibit A–10) between J. M. and M. S. Browning and the Remington Company, dated March 20, 1914, gave the Remington Company the exclusive right to manufacture, use, and sell a certain 22 caliber automatic rifle, invented by J. M. and M. S. Browning, and to all improvements thereafter made on such automatic rifle, in consideration of certain royalties to be paid on the arms manufactured and sold. The patents granted prior to January 2, 1915, covered by the contract of March 20, 1914, (Exhibit A–10) were as follows:

| Number. | Dated. |
| --- | --- |
| 1,065,341 | June 24, 1913. |
| 1,065,342 | June 24, 1913. |
| 1,202,024 | January 6, 1914. |

An application for a patent on the automatic rifle covered by the contract of March 20, 1914, was made on August 18, 1914, and Patent No. 1,202,024 was issued thereon on October 24, 1916.

Manufacture of the rifle covered by the contract of March 20, 1914, (Exhibit A–10) was begun in the year 1917, but because of the outbreak of war, manufacturing operations were suspended in order to make manufacturing facilities available for wartime arms. At the end of the year 1921 royalties had been paid on the contract of March 20, 1914, as follows:

| 1917 | $11,360.75 |
| --- | --- |
| 1921 | 14,789.27 |

(9) The contract (Exhibit A–11) between J. M. and M. S. Browning and the Remington Company, dated August 6, 1914, gave to the Remington Company the exclusive right to manufacture, use, and sell certain repeating shotguns invented by J. M. and M. S. Browning, and to all improvements that might thereafter be made on such repeating shotguns, in consideration of certain royalties to be paid on the arms manufactured and sold. No patent had been issued at the time this contract was entered into, but application for a patent had been made on November 26, 1913, and the patent was issued June 15, 1915, being Patent No. 1,143,170. Because of the expansion of manufacturing facilities during the war period, manufacture of the arms covered by this contract was not begun until after the war period.

(10) The contracts (Exhibits A–12 and A–15) between J. M. and M. S. Browning, and the Belgian Company, dated July 7, 1897, and July 29, 1909, gave to the Belgian Company the exclusive right to manufacture, use, and sell certain automatic pistols invented by J. M. and M. S. Browning, and to all improvements that might thereafter be made on such automatic pistols in consideration of certain royalties to be paid on the arms manufactured and sold. It is im-

possible to determine from the record what patents covered by these contracts had been granted on January 2, 1915, or when the patents existing on that date expired. During the years 1908 to 1921, inclusive, royalties were paid on these contracts as follows:

| 1908 | $41, 827. 36 | 1915 | None. |
|------|------|------|------|
| 1909 | 30, 335. 15 | 1916 | None. |
| 1910 | 31, 484. 88 | 1917 | None. |
| 1911 | 22, 749. 56 | 1918 | None. |
| 1912 | 47, 346. 63 | 1919 | $7, 954. 70 |
| 1913 | 35, 444. 19 | 1920 | 15, 019. 80 |
| 1914 | 33, 772. 40 | 1921 | 14, 303. 50 |

In August, 1914, the factory of the Belgian Company was seized and taken over by the Germans and was not restored to its owners until the year 1918, so that there were no royalties paid on the contracts of July 7, 1897, and July 29, 1909, (Exhibits A–12 and A–13) or on the contracts of December 8, 1903, and January 4, 1913, (Exhibits A–13 and A–14) hereinafter described during the years 1915 to 1918, inclusive.

(11) The contract (Exhibit A–13) between J. M. and M. S. Browning and the Belgian Company, dated December 8, 1903, gave the Belgian Company the exclusive right to manufacture, use, and sell a certain automatic rifle and shotgun, invented by J. M. and M. S. Browning, and to all improvements that might thereafter be made on such automatic rifles and automatic shotguns, in consideration of certain royalties to be paid on the arms manufactured and sold. From the record it is impossible to determine what patents covered by this contract had been granted on December 8, 1903, or when the patents existing on that date expired. The automatic shotgun covered by this contract corresponds to the automatic shotgun covered by the contract of December 23, 1903, with the Remington Company, referred to above, and the automatic rifle corresponds to the automatic rifle covered by the contract with the Remington Company dated June 11, 1904. Royalties paid during the years 1908 to 1921, inclusive, on the contract of December 8, 1903, (Exhibit A–13) were as follows:

| 1908 | $2, 782. 30 | 1915 | None. |
|------|------|------|------|
| 1909 | 4, 410. 83 | 1916 | None. |
| 1910 | 4, 811. 32 | 1917 | None. |
| 1911 | 3, 549. 82 | 1918 | None. |
| 1912 | 3, 910. 50 | 1919 | $2, 324. 40 |
| 1913 | 3, 391. 69 | 1920 | 2, 088. 60 |
| 1914 | 1, 547. 40 | 1921 | 3, 027. 00 |

(12) The contract (Exhibit A–14) between J. M. and M. S. Browning and the Belgian Company, dated January 4, 1913, gave the Belgian Company the exclusive right to manufacture, use, and

sell a certain 22 caliber automatic rifle invented by J. M. and M. S. Browning, and all improvements that might thereafter be made on such 22 caliber automatic rifle, in consideration of certain royalties to be paid on the rifles manufactured and sold. It is impossible to determine from the record what patents covered by this contract corresponded to the automatic rifle covered by the contract of March 20, 1914, (Exhibit A–10) with the Remington Company. The royalties paid on the contract of January 4, 1913, during the years 1913 to 1921, inclusive, were:

| | | | |
|---|---|---|---|
| 1913 | None. | 1918 | None. |
| 1914 | $592. 20 | 1919 | $1, 565, 00 |
| 1915 | None. | 1920 | 1, 326. 00 |
| 1916 | None. | 1921 | 1, 080. 30 |
| 1917 | None. | | |

(13) The contracts of June 12, 1906, and November 10, 1913, (Exhibits A–16 and A–17) between J. M. and M. S. Browning and the Stevens Company, gave the Stevens Company the exclusive right to manufacture, use, and sell certain repeating shotguns invented by J. M. and M. S. Browning in consideration of certain royalties to be paid on the guns manufactured and sold. The contracts did not, however, give to the Stevens Company the right to improvements on such shotguns that might thereafter be made by the Browning Company. The patents which had been granted prior to January 2, 1915, and which were covered by the contracts of June 12, 1906, and November 10, 1913, (Exhibits A–16 and A–17) were as follows:

| Number. | Dated. |
|---|---|
| 550, 778 | December 3, 1895. |
| 577, 281 | February 16, 1897. |
| 781, 765 | February 7, 1905. |
| 864, 609 | August 27, 1907. |

The royalties paid during the years 1909 to 1921, inclusive, on the contracts of June 12, 1906, and November 10, 1913, (Exhibits A–16 and A–17) were:

| | | | |
|---|---|---|---|
| 1909 | $4, 291. 20 | 1916 | $1, 168. 00 |
| 1910 | 3, 422, 00 | 1917 | 874. 80 |
| 1911 | 3, 234. 80 | 1918 | 1, 338. 40 |
| 1912 | 3, 407. 20 | 1919 | 1, 317. 20 |
| 1913 | 2, 175. 60 | 1920 | 4, 246. 80 |
| 1914 | 2, 195. 60 | 1921 | 727. 20 |
| 1915 | 807. 20 | | |

(14) The Colts Patent Firearms Manufacturing Co., the Remington Arms Co., and the J. Stevens Arms Co., were on January 2, 1915, had been for many years prior to that date, and were subsequent thereto, large, conservative, and amply financed concerns with consistent records of stability and ability to carry out their undertakings, and occupied a predominant position in the firearms manufacturing

business in the United States. The Colts Company's factory was the only one in the United States equipped to manufacture machine guns in quantity at the beginning of the year 1915. The Fabrique Nationale d'Armes de Guerre occupied the same position in the firearms field in Europe that the Colts, Remington, and Winchester companies did in the United States.

(15) The 45 caliber automatic pistol which was covered by the contracts of July 24, 1896, and January 11, 1902, (Exhibits A–1 and A–2) between J. M. and M. S. Browning, and the Colts Company, was adopted as the official side arm of the United States Army in the year 1911 or 1912.

(16) The machine gun became a proved military weapon about 1898, and tactics and improvements in guns after that time and up to the time of the World War, made it fairly certain that the machine gun would play a major part in modern warfare. The first weeks of the World War made known to the Allies the superior equipment of the Germans in regard to machine guns, and their own need for them in large quantities. Inquiries were made of various gunmakers in the United States as to their ability to produce machine guns, but the possibilities of quantity manufacture in the United States were limited to the Colts factory, that being the only factory capable of large-scale production in the United States. Furthermore, no machine gun could be considered that had not completed a period of testing and experimentation. The machine guns invented by the Brownings were adapted to quantity production and required practically no handwork in finishing and less precision in manufacturing. The inventions of J. M. Browning and M. S. Browning were tested and experimented with fully before application was made for patents, and the machine guns made under the Browning patents were much cheaper to make than the Vickers, the Lewis, or the Maxim machine guns, and were superior in simplicity of design, sureness of function, and durability.

The Colts patent machine gun covered by the contract of April 6, 1903, (Exhibit A–6) had been manufactured and sold by the Colts Company for many years prior to the second day of January, 1915. The average annual production of the said Colts machine gun for the years 1909 to 1913, inclusive, and the average annual demand for said gun during the said period, was approximately 40 guns per year. During the last five months of the year 1914 the Colts Company received orders for 2,188 Colts machine guns. These orders emanated from many and various sources, among which were Canada, Spain, Belgium, France and England. On January 2, 1915, there was a reasonable expectation and certainty that 100,000 Colts machine guns would be ordered during the war.

On December 10, 1915, the Colts Company entered into a written contract with the Marlin Arms Corporation, whereby the Marlin Corporation was given the right to manufacture and sell the Colts machine gun. By the terms of the contract the Colts Company was to receive $100 per gun for the first 5,000 guns manufactured, out of which the taxpayer herein was to receive $45 per gun. After the first 5,000 guns the Colts Company was to receive $75 per gun until it had received $1,500,000, out of which $75 per gun the taxpayer was to receive $45.

(17) The Browning heavy machine gun which, as above stated, came within the provisions of the contract of April 6, 1903, (Exhibit A-6) between the Brownings and the Colts Company, was completed in the latter part of the year 1914, and the War Department and the Colts Company knew of its existence and that it fell within the provisions of Exhibit A-6. However, it was not manufactured and put on the market until after the United States entered the World War. Application for a patent on this machine gun was made October 13, 1916, but at the request of the War Department the patent was held up and was not issued until February 4, 1919.

(18) During the month of September, 1917, the United States Government placed an order for 15,000 water-cooled Browning machine guns with the Remington Arms-Union Metallic Cartridge Co. of Bridgeport, Conn., and an order for 5,000 Browning aircraft machine guns, and 20,000 Browning automatic rifles with the Marlin-Rockwell Corporation of New Haven, Conn. In October, 1917, the United States Government placed an order for 25,000 Browning automatic rifles with the Winchester Repeating Arms Co. of New Haven, Conn. In December, 1917, an additional order for 10,000 Browning aircraft guns was placed with the Marlin-Rockwell Corporation. About the same time a contract for Browning aircraft guns was also given to the Remington Arms-Union Metallic Cartridge Co.

On October 31, 1917, at the suggestion of representatives of the Ordnance Department of the United States Army, J. M. Browning and M. S. Browning, representing the taxpayer, met with certain officials of the Ordnance Department, for the purpose of arriving at an adjustment of the rights accrued to the taxpayer and others by reason of contracts entered into by the United States Government and certain manufacturing concerns in regard to firearms upon which J. M. and M. S. Browning held patents and in which the taxpayer had a royalty interest by reason of the contracts hereinbefore mentioned. These manufacturing concerns had no rights covering the firearms which they had contracted to manufacture, such rights being held by the Colts Company. The Government desired

to place its contracts where it saw fit and requested the taxpayer, in lieu of all rights accrued or to be accrued during the period of the war, to accept a certain definite sum. It was thereupon agreed that the taxpayer should receive $750,000 in cash in lieu of its right to royalties during the period of the war under the contract with the Colts Company (Exhibit A–6). A written contract to that effect was entered into by the taxpayer and the United States Government and on March 28, 1918, the taxpayer was paid the amount of $750,000 in accordance with the contract. Pursuant to the said contract, further orders were placed by the United States Government with other manufacturers for machine guns and machine rifles covered by the Browning patents. When the Armistice was signed, orders had been placed by the United States Government with various arms factories for 288,174 Browning machine rifles and 110,000 Browning heavy machine guns, which would have netted the taxpayer at the established royalty rates of $25 and $50 for the machine rifle and machine gun, respectively, the amount of $12,704,350. After the Armistice the United States canceled orders for 37,000 Browning heavy machine guns, 186,000 Browning machine rifles, and 1,300 tank machine guns.

During the year 1918 the United States accepted 56,608 Browning heavy machine guns, 2,816 Colts machine guns, 580 Browning aircraft machine guns, 38 Marlin aircraft machine guns (Colts), 4 Browning tank machine guns, 1,470 Marlin tank machine guns (Colts), and 69,960 Browning machine rifles.

(19) On January 2, 1915, the fair market values of the rights to receive royalties under the contracts hereinabove mentioned, were as follows:

| Exhibits. | Value. | Exhibits. | Value. |
|---|---|---|---|
| A–1 and A–2 | $350,000 | A–11 | $70,000 |
| A–6 | 3,000,000 | A–12 and A–15 | ------ |
| A–7 | 60,000 | A–13 | ------ |
| A–8 | 250;000 | A–14 | ------ |
| A–9 | 40,000 | A–16 and A–17 | 20,000 |
| A–10 | 400,000 | | |

(20) On the known facts, on January 2, 1915, the contracts involved herein would expire on the following dates:

| Exhibits. | Date of expiration. | Exhibits. | Date of expiration. |
|---|---|---|---|
| A–1 and A–2 | August, 1930 | A–10 | October 24, 1933 |
| A–6 | February 4, 1936 | A–11 | June 15, 1932 |
| A–7 | October 23, 1917 | A–12, A–13 | ------ |
| A–8 | February 13, 1923 | A–14 and A–15 | ------ |
| A–9 | February 14, 1928 | A–16 and A–17 | August 27, 1924 |

The petitioner corporation was, as hereinbefore stated, organized in the year 1908. However, the books of the corporation were not

opened until the year 1914. When the books were opened in the year 1914, all the assets owned by the petitioner at that time, including stocks, bonds, cash and real estate, were entered thereon, and a record of the assets was thereafter kept in an accurate manner. There is nothing in the record to show that the values given to such assets on the books of the petitioner in 1914 were other than their cost to the petitioner.

The books of the petitioner were, during the year 1918, kept on the cash receipts and disbursements basis.

The petitioner in its income and profits-tax return for the year 1918, reported a gross income of $381,313.93, of which $345,403.67 was from royalties, and a net income of $189,110.63. No part of the amount of $750,000 received by the petitioner from the United States in the year 1918, as set forth in paragraph 17 herein, was included in the return. In computing its invested capital for the year 1918 the petitioner included the contracts involved herein as paid-in surplus in the amount of $3,000,000. The Commisisoner, upon audit of the petitioner's return for the year 1918, increased the income reported therein by the said amount of $750,000 received by it from the United States. He also determined that while the contracts mentioned were very valuable, their value at January 2, 1915, could not be ascertained, and that the petitioner was not entitled to include any amount in its invested capital on account of said contracts, or to any deduction from gross income as an allowance for the exhaustion of the contracts. He also determined that since the value of the contracts could not be determined, an abnormality in invested capital and income existed within the meaning of section 327 of the Revenue Act of 1918 and he therefore computed the tax liability under the provisions of section 328 of the Revenue Act of 1918, and arrived at a rate of profits taxes as to net income of 27.85 per cent.

OPINION.

MARQUETTE: It may be stated at the outset that the several contracts involved herein are license agreements, authorizing the licensees to make and sell certain firearms covered by patents owned by J. M. and M. S. Browning, and as to the Brownings, the right to receive royalties thereunder. We have heretofore held in the *Appeal of Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179, that license agreements for the use of patents are intangible property within the meaning of the Revenue Act of 1917. In that appeal we said:

The taxpayer relies upon article 811 of Regulations 45 in support of its position that the license agreements were tangible property. That article of the regulations provides that most contracts are intangible property and that

a contract may be regarded as tangible only after a full statement as to its exact nature and a showing to the satisfaction of the Commissioner that it relates to rights in tangible property to such an extent that its value arises chiefly therefrom. This article, however, does not support the position of the taxpayer in this case, as the license agreements do not relate to the machines to such an extent that they derived their chief value therefrom.

Patents, under the Revenue Act of 1917, are not treated as intangibles nor yet specifically as tangibles; the license agreements are one step removed from the patents. They amounted to no more than licenses in the ordinary meaning of that word or privileges to use the processes and mechanism protected by the patents. As such they are intangibles. The article of the regulations above referred to is not authority for holding that contracts or agreements which derive their chief value from *patents* are tangible assets.

The taxes involved in this appeal are for the year 1918 and they arise under the Revenue Act of 1918. By section 325(a) of that Act, patents are specifically called intangible property; and as we have held that, under the Revenue Act of 1917, which does not expressly denominate patents intangible property, license agreements for the use of patents are intangibles, we are of the opinion that agreements of that nature are also clearly intangible property under the Revenue Act of 1918. The right to receive royalties thereunder is likewise intangible property. The petitioner, therefore, by the assignment to it of the contracts mentioned, acquired intangible property.

It may also be stated, without extended discussion, that regardless of the value of the several contracts on January 2, 1915, the date they were acquired by the petitioner, it is not entitled to include that value or any part thereof in its invested capital for the year 1918. The contracts were paid in to the petitioner corporation by the Brownings without any consideration therefor except the nominal consideration of one dollar, and under the decision of this Board in the *Appeal of Herald-Despatch Co.*, 4 B. T. A. 1096, they may not be included in invested capital under section 326(a)(3) of the Revenue Act of 1918. See also *Appeal of Shope Brick Co.*, 5 B. T. A. 1042. This leaves for consideration the questions as to the value of the contracts on January 2, 1915, the amount of the deduction to which the petitioner is entitled in computing its net income for the year 1918 as an allowance for the exhaustion of the contracts; whether or not the amount of $750,000 received by the petitioner from the United States Government in the year 1918 was income, and whether or not the petitioner is entitled to special assessment for the year 1918, and if so, what comparatives should be used.

We have carefully considered the evidence presented relative to the value on January 2, 1915, of the several contracts in question and we are of the opinion that it establishes that they had a fair market value on that date at least equal to the amounts set forth in the findings of fact. The values we have found for the contracts with

the Colts Company (Exhibits A–1, A–2, A–6 and A–7) are, to our minds, established by the testimony of Samuel M. Stone, president of the Colts Company. He testified that on January 2, 1915, it was known that there would be a great demand for machine guns, due to the fact that the World War was then being waged; that no machine gun could be considered that had not completed a long period of testing and experimentation; that the Colts machine gun was admirably adapted to quantity production and the Colts Company was the only manufacturer of machine guns in the United States; and that a demand for at least 100,000 Colt machine guns could readily be seen. On the machine gun contract he placed a value of at least $3,000,000. He also testified that he was familiar with the prior earnings of the automatic pistol and belt loader contracts (Exhibits A–1, A–2 and A–7), and that considering the royalties paid prior to January 2, 1915, and the facts known on that date as to probable future demand, he considered Exhibits A–1 and A–2 were worth at least $350,000, and A–7 was worth at least $60,000. On cross-examination he testified that the Colts Company on January 2, 1915, would have paid $350,000 for the petitioner's rights under Exhibits A–1 and A–2, if the Brownings had been inclined to sell.

The fair market values of the contracts with the Remington Company (Exhibits A–8, A–9, A–10 and A–11) are sufficiently established, to our minds, by the testimony of C. L. Reierson, president of that company. He testified that he was familiar with the contracts, the royalties paid thereon prior to January 2, 1915, and with what was considered the probable future demand on January 2, 1915, of the guns covered by these contracts, in the light of the experiences of his company with the sale of guns of that sort, and conditions as they then existed. He also testified that as a matter of fact the Remington Company paid to the petitioner on Exhibit A–8, subsequent to January 2, 1915, $104,000 more than the amount he testified to as the fair market value of the contract on that date. While the values placed on Exhibits A–10 and A–11 appear too high, in view of subsequent events, he testified that on January 2, 1915, it was believed by the Remington Company that there would be yearly sales of at least 50,000 of the guns covered by Exhibit A–10, and from 8,000 to 10,000 of the guns covered by Exhibit A–11, and that he considered his estimate conservative, in view of manufacturing costs at January 2, 1915. However, he computed the fair market value of these contracts as the total amount of royalties that might reasonably be expected to be paid over the life of the contracts without any allowance in order to arrive at the discount value of these future royalties on January 2, 1915. In view of that fact and the further fact that values of these contracts were more or less speculative, we have not allowed the full values testified

to by Reierson but have reduced them to the amounts shown in the findings of fact.

There is not sufficient evidence before us from which we can determine the values of the Belgian contracts (Exhibits A–12, A–13, A–14 and A–15). Also, as we have stated in the findings of fact, it is impossible to determine from the evidence what patents were covered by these contracts, or when they expired.

We find, from the evidence, that the contracts with the Stevens Company had a fair market value of $20,000 on January 2, 1915.

Having fixed the January 2, 1915, value of the contracts acquired by the petitioner from J. M. and M. S. Browning, we must next determine the amount of the deduction to which the petitioner is entitled for the year 1918 as an allowance for the exhaustion of these contracts. The Commissioner contends that it is impossible to determine when the contracts will expire; that they became more valuable from year to year, since they covered any improvements and patents that might thereafter be invented or taken out by Browning, and that, therefore, the petitioner is not entitled to any deduction for the exhaustion thereof. The petitioner contends that each contract should be considered as expiring with the expiration of the latest patent covered by that contract existing on January 2, 1915, or the patent that might thereafter be issued on inventions made on or before that date. We agree with the petitioner's contention. To hold that the Brownings might make other inventions or take out other patents, which would extend the life of the contracts, would be to enter the realm of pure speculation and that we should not do. As far as the evidence discloses, no patents covered by the contracts herein were taken out subsequent to January 2, 1915, except on guns which were in existence on that date and which were known to come within the scope of the contracts. We therefore hold that the contracts severally expired on the dates set forth in the findings of fact.

The petitioner contends that the allowance for the exhaustion of the contracts involved herein should be computed upon the unit basis; that is, upon the quantity of guns manufactured and sold, rather than by amortizing the January 2, 1915, value of each contract over its remaining life. In the case of the war-arms contracts, it contends that the prewar production and the war years (1915 to 1918, inclusive) production were known at the end of the year 1918; that with the supplies of war guns on hand at the end of 1918, it might safely be assumed that the average yearly postwar production would be the same as the average yearly prewar production, and that the allowance for the exhaustion of these contracts in the year 1918 should bear the same ratio to the January 2, 1915, value of the contracts as the number of guns produced in the year 1918 bears to

the total number of guns produced or estimated to be produced after January 2, 1915. In the case of the other contracts, the petitioner contends that the average yearly demand prior to 1915 may be taken as the average yearly demand over the remaining life of the contracts, and that the allowance for exhaustion of each contract in the year 1918 should bear the same ratio to the value of the contracts on January 2, 1915, as the number of guns produced in that year bears to the total number of guns manufactured and to be manufactured after January 2, 1915. The method contended for by the petitioner is known as the production method, which is based upon the theory that depreciation charges should fluctuate in harmony with fluctuations in production, and is analogous to that used in computing allowances for the depletion of mines, oil wells, and timber. While this method may be the ideal one under some conditions, there are certain difficulties which stand in the way of its practical application in this case. In order to determine an allowance which bears the same ratio to the value of the asset as the production in the year for which the allowance is made bears to the total content producible, the total content must be known or capable of being ascertained with reasonable certainty. Here we know the prewar production under the contracts and the production during the war years. We are asked to assume that the average yearly postwar production under the war arms contracts will be the same as the average yearly prewar production, and that the average yearly production under the other contracts after the year 1914 will be the same as the average yearly production of the years up to and including 1914. This assumed production is at best a mere estimate arrived at by speculation. We think it is impossible to predict with any degree of accuracy, what the future production under the contracts will be. It may or may not be the same as in the prewar years, dependent upon conditions which can not be foreseen. We have declined to speculate or conjecture as to the life of these contracts, although it is entirely possible that they may be extended beyond the date of the expiration of the patents that are now in force, and we are of the opinion that there is less reason to speculate or conjecture as to the future production under the contracts. Furthermore, as in the case of patents, the diminished value of the contracts under consideration on the last day of any accounting period, as compared to the value on the first day thereof, can not be attributed solely to the production thereunder, for the contracts did not cover any specific number of guns; rather the shrinkage in value arises from the fact that on the last day of any accounting period the contracts had one year less to run than on the first day thereof. The shrinkage in value occurs irrespective of production. We are of the opinion that the allowance for the exhaustion

79705°—28——59

of the contracts herein can only be determined on the time basis, by spreading the January 2, 1915, value of each contract ratably over its remaining life after that date.

In its petition the petitioner alleged that the amount of $750,000 paid to it in the year 1918 in lieu of its rights to royalties during the war period under certain contracts with the Colts Company, was not income. At the hearing and in the petitioner's brief that point was given no attention, but the record is not clear that the petitioner intended to abandon it. We are satisfied that the amount in question was clearly income. If the petitioner had insisted upon and received the royalties to which it would have been entitled, the amount of the royalties so received would certainly have been income. When it entered into the agreement with the United States to surrender or waive its rights to royalties and to accept $750,000 therefor, it simply accepted a definite and determined amount instead of an indefinite and undertermined amount that might thereafter be earned. What actually occurred, in the light of subsequent events, was that the petitioner accepted a lesser, determined, present income in lieu of a greater, undetermined, future income; but it was income nevertheless, and we so hold.

The Commissioner, upon audit of the petitioner's return for the year 1918, found that the contracts involved herein were very valuable when acquired by the petitioner, but that their exact value on that date could not be determined, and that, therefore, as he was unable to determine its invested capital, the petitioner was entitled to have its tax liability computed under section 328 of the Revenue Act of 1918, and it was so computed. The Commissioner now contends that if the Board finds the value of the contracts, no abnormality exists in capital or income and that special assessment should not be granted. The petitioner urges, however, that even if the Board is able to find the value of the contracts, it is entitled to special assessment because when the books were opened in the year 1914, the stocks, bonds, real estate and other assets owned by it at that time were not entered on the books at cost; that the cost of these assets can not now be ascertained and that it is, therefore, impossible to determine the petitioner's statutory invested capital.

As set forth in the findings of fact, the petitioner acquired from the Brownings on January 2, 1915, the contracts involved herein, which had at that time a fair market value of $4,190,000. For the reason hereinbefore stated, the value of these contracts may not be included in the petitioner's invested capital for the year 1918. The contracts produced, however, a large part of the petitioner's income for that year. These conditions, we think, constitute an abnormality within the meaning of section 327(d) of the Revenue Act of

1918, which entitles the petitioner to have its tax liability computed under the provisions of section 328 of that Act.

The petitioner has submitted the names of several corporations which it insists are representative corporations engaged in businesses similar to its own business, and it contends that they are proper comparatives to be used in computing the tax under section 328. The evidence presented in support of this contention does not satisfy us that these corporations are proper comparatives as claimed by the petitioner. We therefore hold that the respondent shall compute the petitioner's tax liability for the year 1918 under section 328 of the Revenue Act of 1918, using comparable corporations as defined by that section, and that the tax so computed, upon the basis of income as herein adjusted, shall be final.

*Judgment will be entered on 15 days' notice, under Rule 50.*

STERNHAGEN dissents.