*925 OPINION.
Marquette:
It may be stated at the outset that the several contracts involved herein are license agreements, authorizing the licensees to make and sell certain firearms covered by patents owned by J. M. and M. S. Browning, and as to the Brownings, the right to receive royalties thereunder. We have heretofore held in the Appeal of Dwight & Lloyd Sintering Co., 1 B. T. A. 179, that license agreements for the use of patents are intangible property within the meaning of the Revenue Act of 1917. In that appeal we said:
The taxpayer relies upon article 811 of Regulations 45 in support of its position that the license agreements were tangible property. That article of the regulations provides that most contracts are intangible property and that *926 a contract may be regarded as tangible only after a full statement as to its exact nature and a showing to the satisfaction of the Commissioner that it relates to rights in tangible property to such an extent that its value arises chiefly therefrom. This article, however, does not support the position of the taxpayer in this case, as the license agreement’s do not relate to the machines to such an extent that they derived their chief value therefrom.
Patents, under the Revenue Act of 1917, are not treated as intangibles nor yet specifically as tangibles; the license agreements are one step removed from the patents. They amounted to no more than licenses in the ordinary meaning of that word or privileges to use the processes and mechanism protected by the patents. As such they are intangibles. The article of the regulations above referred to is not authority for holding that contracts or agreements which derive their chief value from patents are tangible assets.
The taxes involved in this appeal are for the year 1918 and they arise under the Revenue Act of 1918. By section 325 (a) of that Act, patents are specifically called intangible property; and as we have held that, under the Revenue Act of 1917, which does not expressly denominate patents intangible property, license agreements for the use of patents are intangibles, we are of the opinion that agreements of that nature are also clearly intangible property under the Revenue Act of 1918. The right to receive, royalties thereunder is likewise intangible property. The petitioner, therefore, by the assignment to it of the contracts mentioned, acquired intangible property.
It may also be stated, without extended discussion, that regardless of the value of the several contracts on January 2, 1915, the date they were acquired by the petitioner, it is not entitled to include that value or any part thereof in its invested capital for the year 1918. The contracts were paid in to the petitioner corporation by the Brownings without any consideration therefor except the nominal consideration of one dollar, and under the decision of this Board in the Appeal of Herald-Despatch Co., 4 B. T. A. 1096, they may not be included in invested capital under section 326(a) (3) of the Revenue Act of 1918. See also Appeal of Shope Brick Co., 5 B. T. A. 1042. This leaves for consideration the questions as to the value of the contracts on January 2,1915, the amount of the deduction to which the petitioner is entitled in computing its net income for the year 1918 as an allowance for the exhaustion of the contracts; whether or not the amount of $750,000 received by the petitioner from the United States Government in the year 1918 was income, and whether or not the petitioner is entitled to special assessment for the year 1918, and if so, what comparatives should be used.
We have carefully considered the evidence presented relative to the value on January 2, 1915, of the several contracts in question and we are of the opinion that it establishes that they had a fair market value on that date at least equal to the amounts set forth in the findings of fact. The values we have found for the contracts with *927 the Colts Company (Exhibits A-l, A-2, A-6 and A-7) are, to our minds, established by the testimony of Samuel M. Stone, president of the Colts Company. He testified that on January 2, 1915, it was known that there would be a great demand for machine guns, due to the fact that the World War was then being waged; that no machine gun could be considered that had not completed a long period of testing and experimentation; that the Colts machine gun was admirably adapted to quantity production and the Colts Company was the only manufacturer of machine guns in the United States; and that a demand for at least 100,000 Colt machine guns could readily be seen. On the machine gun contract he placed a value of at least $3,000,000. He also testified that he was familiar with the prior earnings of the automatic pistol and belt loader contracts (Exhibits A-l, A-2 and A-l), and that considering the royalties paid prior to January 2, 1915, and the facts known on that date as to probable future demand, he considered Exhibits A-l and A-2 were worth at least $350,000, and A-l was worth at least $60,000. On cross-examination he testified that the Colts Company on January 2, 1915, would have paid $350,000 for the petitioner’s rights under Exhibits A-l and A-2, if the Brownings had been inclined to sell.
The fair market values of the contracts with the Eemington Company (Exhibits A-8, A-9, A-10 and A-ll) are sufficiently established, to our minds, by the testimony of C. L. Eeierson, president of that company. He testified that he was familiar with the contracts, the royalties paid thereon prior to January 2, 1915, and with ivhat was considered the probable future demand on January 2, 1915, of the guns covered by these contracts, in the light of the experiences of his company with the sale of guns of that sort, and conditions as they then existed. He also testified that as a matter of fact the Eemington Company paid to the petitioner on Exhibit A-8, subsequent to January 2, 1915, $104,000 more than the amount he testified to as the fair market value of the contract on that date. While the values placed on Exhibits A-10 and A-ll appear too high, in view of subsequent events, he testified that on January 2, 1915, it was believed by the Eemington Company that there would be yearly sales of at least 50,000 of the guns covered by Exhibit A-10, and from 8,000 to 10,000 of the guns covered by Exhibit A-ll, and that he considered his estimate conservative, in view of manufacturing costs at January 2, 1915. However, he computed the fair market value of these contracts as the total amount of royalties that might reasonably be expected to be paid over the life of the contracts without any allowance in order to arrive at the discount value of these future royalties on January 2,1915. In view of that fact and the further fact that values of these contracts were more or less speculative, we have not allowed the full values testified *928 to by Reierson but have reduced them to the amounts shown in the findings of fact.
There is not sufficient evidence before us from which we can determine the values of the Belgian contracts (Exhibits A-12, A-13, A-14 and A-15). Also, as we have stated in the findings of fact, it is impossible to determine from the evidence what patents were covered by these contracts, or when they expired.
We find, from the evidence, that the contracts with the Stevens Company had a fair market value of $20,000 on January 2, 1915.
Having fixed the January 2,1915, value of the contracts acquired by the petitioner from J. M. and M. S. Browning, we must next determine the amount of the deduction to which the petitioner is entitled for the year 1918 as an allowance for the exhaustion of these contracts. The Commissioner contends that it is impossible to determine when the contracts will expire; that they became more valuable from year to year, since they covered any improvements and patents that might thereafter be invented or taken out by Browning, and that, therefore, the petitioner is not entitled to any deduction for the exhaustion thereof. The petitioner contends that each contract should be considered as expiring with the expiration of the latest patent covered by that contract existing on January 2, 1915, or the patent that might thereafter be issued on inventions made on or before that date. We agree with the petitioner’s contention. To hold that the Brownings might make other inventions or take out other patents, which would extend the life of the contracts, would be to enter the realm of pure speculation and that we should not do. As far as the evidence discloses, no patents covered by the contracts herein were taken out subsequent to January 2, 1915, except on guns which were in existence on that date and which were known to come within the scope of the contracts. We therefore hold that the contracts severally expired on the dates set forth in the findings of fact.
The petitioner contends that the allowance for the exhaustion of the contracts involved herein should be computed upon the unit basis; that is, upon the quantity of guns manufactured and sold, rather than by amortizing the January 2, 1915, value of each contract over its remaining life. In the case of the war-arms contract.-;, it contends that the prewar production and the war years (1915 to 1918, inclusive) production were known at the end of the year 1918; that with the supplies of war guns on hand at the end of 1918, it might safely be assumed that the average yearly postwar production would be the same as the average yearly prewar production, and that the allowance for the exhaustion of these contracts in the year 1918 should bear the same ratio to the January 2, 1915, value of the contracts as the number of guns produced in the year 1918 bears to *929 the total number of guns produced or estimated to be produced after January 2, 1915. In the case of the other contracts, the petitioner contends that the average yearly demand prior to 1915 may be taken as the average yearly demand over the remaining life of the contracts, and that the allowance for exhaustion of each contract in the year 1918 should bear the same ratio to the value of the contracts on January 2, 1915, as the number of guns produced in that year bears to the total number of guns manufactured and to be manufactured after January 2,1915. The method contended for by the petitioner is known as the production method, which is based upon the theory that depreciation charges should fluctuate in harmony with fluctuations in production, and is analogous to that used in computing allowances for the depletion of mines, oil wells, and timber. While this method may be the ideal one under some conditions, there are certain difficulties which stand in the way of its practical application in this case. In order to determine an allowance which bears the same ratio to the value of the asset as the production in the year for which the allowance is made bears to the total content producible, the total content must be known or capable of being ascertained with reasonable certainty. Here we know the prewar production under the contracts and the production during the war years. We are asked to assume that the average yearly postwar production under the war arms contracts will be the same as the average yearly prewar production, and that the average yearly production under the other contracts after the year 1914 will be the same as the average yearly production of the years up to and including 1914. This assumed production is at best a mere estimate arrived at by speculation. We think it is impossible to predict with any degree of accuracy, what the future production under the contracts will be. It may or may not be the same as in the prewar years, dependent upon conditions which can not be foreseen. We have declined to speculate or conjecture as to the life of these contracts, although it is entirely possible that they may be extended beyond the date of the expiration of the patents that are now in force, and wo are of the opinion that there is less reason to speculate or conjecture as to the future production under the contracts. Furthermore, as in the case of patents, the diminished value of the contracts under consideration on the last day of any accounting period, as compared to the value on the first day thereof, can not be attributed solely to the production thereunder, for the contracts did not cover any specific number of guns; rather the shrinkage in value arises from the fact that on the last day of any accounting period the contracts had one year less to run than on the first day thereof. The shrinkage in value occurs irrespective of production. We are of the opinion that the allowance for the exhaustion *930 of the contracts herein can only be determined on the time basis, by spreading the January 2, 1915, value of each contract ratably over its remaining life after that date.
In its petition the petitioner alleged that the amount of $150,000 paid to it in the year 1918 in lieu of its rights to royalties during the war period under certain contracts with the Colts Company, was not income. At the hearing and in the petitioner’s brief that point was given no attention, but the record is not clear that the petitioner intended to abandon it. We are satisfied that the amount in question was clearly income. If the petitioner had insisted upon and received the royalties to which it would have been entitled, the amount of the royalties so received would certainly have been income. When it entered into the agreement with the United States to surrender or waive its rights to royalties and to accept $150,000' therefor, it simply accepted a definite and determined amount instead of an indefinite and undertermined amount that might thereafter be earned. What actually occurred, in the light of subsequent events, was that the petitioner accepted a lesser, determined, present income in lieu of a greater, undetermined, future income; but it was income nevertheless, and we so hold.
The Commissioner, upon audit of the petitioner’s return for the year 1918, found that the contracts involved herein were very valuable when acquired by the petitioner, but that their exact value on that date could not be determined, and that, therefore, as he was unable to determine its invested capital, the petitioner was entitled to have its tax liability computed under section 328 of the Eevenue Act of 1918, and it was so computed. The Commissioner now contends that if the Board finds the value of the contracts, no abnormality exists in capital or income and that special assessment should not be granted. The petitioner urges, however, that even if the Board is able to find the value of the contracts, it is entitled to special assessment because when the books were opened in the year 1914, the stocks, bonds, real estate and other assets owned by it at that time were not entered on the books at cost; that the cost of these assets can not now be ascertained and that it is, therefore, impossible to determine the petitioner’s statutory invested capital.
As set forth in the findings of fact, the petitioner acquired from the Brownings on January 2, 1915, the contracts involved herein, which had at that time a fair market value of $4,190,000. For the reason hereinbefore stated, the value of these contracts may not be included in the petitioner’s invested capital for the year 1918. The contracts produced, however, a large part of the petitioner’s income for that year. These conditions, we think, constitute an abnormality within the meaning of section 327 (d) of the Eevenue Act of *931 1918, which entitles the petitioner to have its tax liability computed under the provisions of section 328 of that Act.
The petitioner has submitted the names of several corporations which it insists are representative corporations engaged in businesses similar to .its own business, and it contends that they are proper comparatives to be used in computing the tax under section 328. The evidence presented in support of this contention does not satisfy us that these corporations are proper comparatives as claimed by the petitioner. We therefore hold that the respondent shall compute the petitioner’s tax liability for the year 1918 under section 328 of the Revenue Act of 1918, using comparable corporations as defined by that section, and that the tax so computed, upon the basis of income as herein adjusted, shall be final.
Judgment will ~be entered on 15 days' notice, under Bule 50.
Sterni-iagen dissents.